**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EVERETT D. TURNER,                           :
                                             :
                    Plaintiff,               :        C.A. No.  05-716 GMS
                                             :
        v.                                   :        TRIAL BY JURY DEMANDED
                                             :
                                             :
CITY OF WILMINGTON,                          :
                                             :
                    Defendant.               :

**DEFENDANT'S OPENING BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendant City of Wilmington

September 1, 2006

## TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     TURNER'S PATROL OF THE SIXTEENTH DISTRICT OF THE F SQUAD . . . . . . 3

      B.     TURNER'S INTRA-PLATOON TRANSFER FROM THE SIXTEENTH DISTRICT TO THE ELEVENTH DISTRICT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.     TURNER'S INTERNAL COMPLAINT OF DISCRIMINATION . . . . . . . . . . . . . . . . 5

      D.     THE CITY'S INVESTIGATION OF TURNER'S INTERNAL COMPLAINT . . . . . . 5

            1.     WRITTEN QUESTIONNAIRE TO THE F SQUAD MEMBERS . . . . . . . . . 6

            2.     INSPECTOR WRIGHT'S INTERVIEW OF LT. ROCK . . . . . . . . . . . . . . . . 7

            3.     INSPECTOR WRIGHT'S INTERVIEW OF TURNER . . . . . . . . . . . . . . . . 8

            4.     THE WRITTEN REPRIMAND TO LT. ROCK FOR USE OF PROFANITY . 8

      E.     TURNER'S COMMUTATION TO EARLY RETIREMENT . . . . . . . . . . . . . . . . . . . 8

      F.     TURNER'S EEOC COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      I.    THE CITY IS ENTITLED TO SUMMARY JUDGMENT FOR TURNER'S CLAIM OF RACE DISCRIMINATION ARISING FROM TITLE VII BECAUSE TURNER HAS FAILED TO ESTABLISH A RACIALLY HOSTILE WORK ENVIRONMENT- COUNT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          A.     TURNER HAS NOT SUFFERED ANY INTENTIONAL RACE-BASED DISCRIMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            1.     THE SINGULAR QUOTATION OF THE RACIAL EPITHET . . . . 13

            2.     RACIALLY NEUTRAL USE OF PROFANITY . . . . . . . . . . . . . . . 14

          B.     TURNER'S ALLEGATIONS OF RACE DISCRIMINATION WERE NEITHER SEVERE NOR PERVASIVE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            1.     INFREQUENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2.       LACK OF ANY PHYSICALLY THREATENING CONDUCT . . . . 18

3.       INTERFERENCE WITH WORK PERFORMANCE . . . . . . . . . . . . 18

4.       TURNER'S PSYCHOLOGICAL WELL BEING . . . . . . . . . . . . . . 19

C.       THE RACE-NEUTRAL PROFANITY WOULD NOT OBJECTIVELY AFFECT A REASONABLE PERSON OF TURNER'S RACE . . . . . . . . . . . . . . . . . . 19

D.       TURNER CANNOT ESTABLISH THE CITY'S RESPONDEAT SUPERIOR LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1.       RESPONDEAT SUPERIOR LIABILITY FOR CO-WORKER'S HARASSMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2.       RESPONDEAT SUPERIOR LIABILITY FOR SUPERVISOR'S HARASSMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.     THE CITY IS ENTITLED TO SUMMARY JUDGMENT FOR TURNER'S AGE DISCRIMINATION CLAIMS BECAUSE TURNER HAS FAILED TO ADDUCE EITHER DIRECT EVIDENCE UNDER THE *PRICE WATERHOUSE* TEST OR INDIRECT EVIDENCE UNDER THE *MCDONNELL DOUGLAS* TEST, AND THE CITY HAS NONETHELESS ADDUCED NON-DISCRIMINATORY REASON FOR ITS EMPLOYMENT DECISION - COUNTS II & III . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A.       TURNER'S FAILURE TO MEET THE *PRICE WATERHOUSE* STANDARD FOR "DIRECT EVIDENCE" CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.       TURNER'S FAILURE TO MEET THE *MCDONNELL DOUGLAS* STANDARD FOR "INDIRECT EVIDENCE" CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

1.       TURNER'S LACK OF QUALIFICATIONS FOR THE JOB HE SEEKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2.       TURNER'S FAILURE TO IDENTIFY AN ADVERSE EMPLOYMENT ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3.       TURNER'S INABILITY TO PROVE THAT HE WAS TREATED ANY DIFFERENTLY THAN SIMILARLY SITUATED POLICE OFFICERS UNDER THE AGE OF FORTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C.       THE CITY'S IRREBUTTABLE, NON-DISCRIMINATORY REASON FOR THE EMPLOYMENT DECISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.    THE CITY IS ENTITLED TO SUMMARY JUDGMENT FOR TURNER'S RETALIATION CLAIM BECAUSE TURNER CANNOT ESTABLISH A PRIMA FACIE CLAIM UNDER *MCDONNELL DOUGLAS*, NOR CAN HE REBUT THE CITY'S NON-DISCRIMINATORY JUSTIFICATION FOR ITS EMPLOYMENT DECISION- COUNT IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      A.    TURNER'S FAILURE TO ESTABLISH THE PRIMA FACIE CLAIM  . . . . 32

          1.    LACK OF ADVERSE EMPLOYMENT ACTION  . . . . . . . . . . . . . 33

          2.    LACK OF CASUAL NEXUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      B.    THE NON-DISCRIMINATORY JUSTIFICATION FOR THE EMPLOYMENT
          DECISION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## **TABLE OF CITATIONS**

### **Cases**

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Andrews v. City of Philadelphia,*  895 F.2d 1469 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 20

*Arasteh v. MBNA*, 146 F. Supp.2d 476 (D.Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 16

*Baker v. Wilmington Trust Co.*, 320 F.Supp.2d 196 (D.Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*Bell v. Waste Management*, 2004 U.S. Dist. LEXIS 21864 (D. Del. 2004) . . . . . . . . . . . . . . .  17, 18, 19

*Bernard v. Nexstar Broad Group, Inc.,*146 Fed. Appx. 582 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . .  30

*Bray v. Marriott Hotels*, 110 F.3d 986 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*Burlington v. White*, ____ U.S. ____, 126 S. Ct. 2405 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 33

*Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 33

*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (U.S. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*DiIenno v. Goodwill Indus.,* 162 F.3d 235 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*Duff v. Paper Magic Group, Inc.,* 265 F.3d 163 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*DuPont Country Club v. Delaware DOL*, 1986 Del.Super. LEXIS 1076 (1986) . . . . . . . . . . . . . . . . .  25

*EEOC v. Rite Aid Corp.*, 2005 U.S. Dist. LEXIS 32898 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . .  11

*Ellerth. v.Burlington Indus.*, 524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Fallon v. Meissner,* 2003 U.S. App. LEXIS 8277 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . .  27, 28

*Faragher v.City of Boca Rotan*, 524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 23

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26, 30, 34, 35

*Glanzman v. Metropolitan Mgmt. Corp.*, 391 F.3d 506 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . .  25, 29

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Hicks v. St. Mary's Honor Ctr.*, 509 U.S. 502 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*Jensen v. Potter*, 2006 U.S. App. LEXIS 2316 (3d Cir. 2006) . . . . . . . . . . . . . 12, 13, 14, 16, 20, 21, 23

*Kidd v. MBNA*, 224 F. Supp. 2d 807(D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Kunin v. Sears Roebuck & Co.*, 175 F.3d 289 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lyle v. Phila. Gas Works,* 2005 U.S. App. LEXIS 22260 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . 26, 30

*Mack v. Greenville Ret. Cmty. LLC*, 2001 U.S. Dist. LEXIS 17427 (D. Del. 2001) . . . . . . . . . . . . . . 14

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . 2, 26, 30, 31, 32, 33, 34, 35

*Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Mondzelewski v. Pathmark Stores, Inc.,* 162 F.3d 778 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Paris v. Christiana Care Visiting Nurse Ass'n*, 197 F. Supp. 2d 111 (D. Del. 2002) . . . 15, 16, 17, 18, 19

*Peace v. Shellhorn & Hill, Inc.,* 2005 U.S. Dist. LEXIS 2533 (D. Del. 2005) . . . . . . . . . . 25, 29, 30, 31

*Pennsylvania State Police v. Suder,* 542 U.S. 129 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24

*Persinger v. Delmar School District*, 2004 U.S.Dist. LEXIS 12805(D.Del. 2004) . . . . . . . . . 12, 13, 14

*Poland v. Computer Sciences Corp.*, 2005 U.S. Dist. LEXIS 22618 (D. Del. 2005) . . . . . . . . . . . . 11, 33

*Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989)_. . . . . . . . . . . . . . . . . . . . . . . . . . . _25, 26, 29, 30, 31

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Seabrook v. Gadow*, 2003 U.S. Dist. LEXIS 10096 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Seldomridge v. Uni-Marts, Inc.*, 2001 U.S. Dist. LEXIS 9491 (D. Del. 2001) . . . . . . . . . . . . . 18, 19, 20

*Snik v. Verizon Wireless*, 2005 U.S. App. LEXIS 28314 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . 27, 30

*St. Mary's Honor Society v. Hicks*, 509 U.S. 502 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Trunzo v. Ass'n of Prop. Owners of the Hideout, Inc.,*
    2004 U.S.App. LEXIS 1639 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tucker v. Merck & Co. Inc.*, 2005 U.S.App. LEXIS 9087 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 12

*Walker v. Pepsi-Cola Bottling Co.*, 2000 U.S. Dist. LEXIS 12635 (D. Del. 2000) . . . . . . . . . 17, 18, 19

**Statutes**

<u>Federal</u>

29 <u>U.S.C.</u> 623(a) ................................................................. 1

42 <u>U.S.C.</u> §2000 ................................................................. 1

42 <u>U.S.C.</u> §2000e ................................................................ 1

<u>State</u>

19 <u>Del.C.</u> § 701 ............................................................... 1

<u>City</u>

1 <u>Wilm. Ch.</u> §39-126 .......................................................... 9

## Court Rules

Fed. R. Civ. P. 56(c) ........................................................ 11

Fed. R. Civ. P. 56(e) ........................................................ 26

Fed. R. Evid. 801(c) ......................................................... 26

Fed. R. Evid. 802 ............................................................ 26

Fed. R. Evid. 805 ............................................................ 26

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff, Everett Turner ("Turner"), filed a four-count Complaint against Defendant, City of Wilmington ("the City"), arising from Turner's former employment as a City police officer. Turner alleges that the City discriminated against him due to his race (African-American) and age (over 40), as well as subjected him to retaliation for complaining about race-based discrimination. Turner's race discrimination and retaliation claims arise from Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 & 2000e. Turner's age discrimination claims arise from the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a) et seq., and its state law counterpart, 19 Del.C. § 701 et seq.

Discovery consisted of Turner's deposition, his responses to twenty-six interrogatories and twenty requests for admissions, as well as his production of two hundred seventy-four pages of documents. The City produced all documents identified in its initial disclosures. Turner did not propound any discovery, nor did he depose any witnesses identified in the City's initial disclosures. Discovery closed on August 25, 2006. This is the City's Opening Brief in support of its Motion for Summary Judgment on Counts I through IV of Turner's Complaint.

## SUMMARY OF ARGUMENTS

The City is entitled to judgment as a matter of law on Count I, Turner's race-based Title VII claim, for any one of the following four reasons. First, Turner has not established any intentional race-based discrimination. Second, Turner has not identified any conduct that was severe or pervasive. Third, Turner has not identified any conduct that would be objectively detrimental to a reasonable person in Turner's position. Fourth, Turner cannot establish the City's respondeat superior liability for conduct about which Turner complains.

The City is entitled to judgment as a matter of law on Counts II and III, the federal and state age discrimination claims, respectively, because Turner cannot adduce any direct evidence under the *Price Waterhouse* test or any indirect evidence under the *McDonnell Douglas* test. Even if Turner could adduce sufficient evidence under either test, his age discrimination claims would nonetheless fail because he cannot rebut the City's non-discriminatory reason for its employment decision.

The City is entitled to judgment as a matter of law on Count IV, the retaliation claim, for the following three reasons. First, Turner has not identified any adverse employment action that would qualify as retaliation. Second, Turner has not established a causal nexus between his protected activity and the allegedly adverse action. Third, Turner cannot rebut the City's non-discriminatory reason for the employment decision that Turner perceives as retaliatory.

## STATEMENT OF FACTS

Turner was a City police officer from 1989 until 2004.  (Pltf's Cmpl. ¶4)    On January 26, 2004, Turner submitted to the Police Chief an internal complaint about race discrimination.  (A28-31)[1]    The internal complaint alleged that Turner's intermediate supervisor, Lt. Mitchell Rock ("Lt. Rock"), created a racially hostile work environment.  (A28-31) On that same day, Turner also applied for disability leave, purportedly due to work-related stress. (Pltf's Cmpl. ¶19)   While Turner was on disability leave, he filed a charge with the Equal Employment Opportunity Commission ("the EEOC"), alleging age and race discrimination, as well as retaliation by Lt. Rock.  (A32-36)  Ultimately, those three allegations form the basis of this lawsuit.

### A.    TURNER'S PATROL OF THE SIXTEENTH DISTRICT OF THE F SQUAD

From March of 2002 until January 26, 2004, Turner was a member of F squad, which is the community sector specialist squad.  (Pltf's Cmpl. ¶19) The Wilmington Police Department is divided into six overlapping police squads, designated A through F. (Rock Aff. ¶3 - A54)  Each squad patrols the entire city, divided among geographic radio districts numbered ten through nineteen. (A85)  Squads A through E are regular patrol squads that respond to radio calls for service.  (Rock Aff. ¶3 - A54)  Because F squad is the community sector squad, its officers generally do not answer radio calls for service.  (Rock Aff. ¶3 - A54)  Rather, F squad officers patrol their geographic districts with a primary focus on self-initiated community policing (as opposed to complaint-driven policing).  (Rock Aff. ¶3 - A54)

Turner was one of four F squad officers who patrolled the sixteenth district, which covers West Center City.  (Jones Aff. ¶1 - A52) When Turner worked in the sixteenth district, the ages of F squad officers ranged from twenty-eight to forty-six. (Turner A213) (Henry Aff. ¶5 - A51)  Turner's patrol partner in the sixteenth district was Robert Curry, a Caucasian who is older than Turner.  (Turner A213) (Henry Aff. ¶5 -

---

[1]Throughout this Opening Brief, the Appendix will be cited as "A__".  References to depositions and affidavits will cite the affiant's or deponent's last name and the corresponding pages in the Appendix.

A51)  Kurtis Crawford and Mitchell Rentz (Caucasians in their early thirties) were the other two officers in the sixteenth district.  (Turner A213-214) (Henry Aff. ¶5 - A51)  Sgt. Corey Staats ("Sgt. Staats"), an African-American, was the first line supervisor of the sixteenth district.   (Turner A212)  Lt. Rock, a Caucasian, was head of the entire F squad.  (Turner A211).  In that capacity, Lt. Rock oversaw the first line supervisors of each district within the F squad.  (Turner A211)  Captain Marlyn Dietz was Lt. Rock's supervisor, serving as the direct liaison between Lt. Rock and the Police Chief.  (Turner A258)

B.    TURNER'S INTRA-SQUAD TRANSFER FROM THE SIXTEENTH DISTRICT TO THE ELEVENTH DISTRICT

On January 14, 2004, Lt. Rock, Sgt. Staats, and Sgt. Scott Jones ("Sgt. Jones") met to discuss the overall performance of F squad.  (Jones Aff. ¶3 - A52) Sgt. Jones was the supervising sergeant of the eleventh district of F squad, which covers the eastside of Wilmington. (Jones Aff. ¶2 - A52 ) At that meeting, Sgt. Staats suggested moving Turner out of F squad and replacing him with another officer who would be more motivated.  (Staats Aff. ¶6 - A58)(Jones Aff. ¶5 - A52) Rather than transfer Turner out of F squad entirely, Sgt. Jones volunteered to take Turner in the eleventh district. (Jones Aff. ¶5 - A52) Lt. Rock approved the transfer.  (Staats Aff. ¶6 - A58) Sgt. Staats selected Fray Lynch, an African-American female, to replace Turner in the sixteenth district. (Staats Aff. ¶7 - A58)  Sgt. Staats selected Lynch because she was self-motivated and capable of performing self-initiated activity.   (A58) These job traits are particularly important for F squad, given that F squad is self-initiated rather than complaint-driven.

After the transfer, Turner worked in the eleventh district with his new patrol partner, Officer Michael Gifford.  (Pltf's Cmpl. ¶19)  Turner and Gifford worked together for one week.  (Gifford Aff. ¶6 - A80) According to Gifford, during that week Turner abandoned him after a major drug bust.  (Gifford Aff. ¶6 - A81 )  The next day, Gifford confronted Turner about abandoning him on the job.  (Gifford Aff. ¶7 - A81) That was the last day Turner and Gifford worked together before Turner applied for disability leave, purportedly due to work-related stress.  (Gifford Aff. ¶7 - A81)(Pltf's Cmpl. ¶19)

C.    TURNER'S INTERNAL COMPLAINT OF RACE DISCRIMINATION

The day Turner began his disability leave, he also submitted to the Police Chief an internal complaint alleging race discrimination by Lt. Rock ("the internal complaint"). (A28-31) The internal complaint stated five discreet events of purported discrimination, four of which are restated in Turner's Complaint in this lawsuit. (A28-31) First, Turner alleged that Lt. Rock referred to him as "mother f---er" and "blank"[2] during roll call. (A28 & Pltf's Cmpl. ¶9) Second, Turner alleged one instance in which Lt. Rock quoted the word "nigger" in his presence (A & Pltf's Cmpl. ¶11). However, Turner conceded that the word was in the form of a quotation while recounting a story, and it was not directed to Turner personally. (A28) Third, Turner alleged that on another occasion Lt. Rock told him to "shut the f--- up and sit the f--- down." (A28) Fourth, Turner claimed that on yet another occasion Lt. Rock snatched a clipboard from Turner's hands while addressing him with profanity. (A28-29 & Pltf's Cmpl. ¶12) Fifth, Turner claimed that Lt. Rock told him and his then-partner, Corporal Curry, that they were "f---ing up on and off duty." (A29 & Pltf's Cmpl. ¶13)

D.    THE CITY'S INVESTIGATION OF TURNER'S INTERNAL COMPLAINT

Turner's internal complaint was investigated by the Police Department's Office of Professional Standards ("OPS"), commonly known as the internal affairs division. (A154-156) Inspector James Wright, an African-American, was assigned to conduct the investigation. (A154-156) The investigation began with written questionnaires directed to Turner's colleagues in F squad. (A59-105) Additionally, Inspector Wright conducted separate interviews of Lt. Rock and Turner. (A106-153) The investigation ended with a written reprimand to Lt. Rock for use of profanity. (A157)

---

[2]"Blank" is a race-neutral term that loosely means "loser" or "zero". Although Turner subjectively believes that "blank" is a racial epithet, his colleagues (including an African-American colleague, Alvin Boardley) confirm that "blank" is indeed a race-neutral term. (A98)

1.    <u>WRITTEN QUESTIONNAIRES TO THE F SQUAD OFFICERS</u>

The written questionnaires to the F squad officers posed seven questions about the allegations described in Turner's internal complaint.  Specifically, the F squad officers were asked if they witnessed any of the following: (1) confrontations between Lt. Rock and Turner; (2) Turner being subjected to rude, humiliating or racial comments by Lt. Rock; (3) Lt. Rock calling Turner "mother f-–er" or "blank"; (4) Lt. Rock telling Turner to "shut the f--- up and sit the f--- down"; (5) Lt. Rock snatching a clipboard from Turner's hands while addressing him with profanity; (6) any altercations between Lt. Rock and any other officer; and (7) Lt. Rock using the word "nigger."  (A59-105)

Each officer denied any confrontations between Turner and Lt. Rock.  (A59-105) Each officer also denied that Turner was ever subjected to rude, humiliating or racial comments by Lt. Rock.  (A59-105) None of the officers could verify whether Lt. Rock called Turner a "mother f---er." (A59-105) Only three officers could verify that Lt. Rock used the word "blank", but each of those three officers admitted that "blank" was used in a non-threatening manner.[3]  (A63-98)  None of the officers could confirm in their questionnaire responses that Lt. Rock told Turner to "sit the f--- down and shut the f--- up".  Later, two other officers (Curry and Lynch) did separately confirm that they heard this comment. (A59-105, 155) As to the "clipboard" incident, Alvin Boardley was the only witness, but he admitted that it was just a joke.  (A98 & 155)

Lastly, with regard to Lt. Rock's singular quotation of the racial slur, the F squad officers verified that the quotation was in the context of a story, and was not directed to Turner or anyone else.  (A59-105, 108, 155)  The quotation arose from Lt. Rock's story about the arrest of an African-American suspect many years earlier.  (A59-105, 108)  According to the story, the suspect resisted arrest and aggressively fought

---

[3]These three officers further explained that "blank" is a race-neutral term.  Corporal Alvin Boardley, an African-American, claimed that he is not offended by the word "blank".  (A98)  Corporal John Burns, a Causasian, stated that Lt. Rock referred to *everyone* as a "blank", but in only a "jovial manner".  (A71) Corporal Porfirio Alequine, an Hispanic, stated that Lt. Rock called various personnel "blank", but only in a joking manner. (A63)

several officers.  (A59-105,108) The suspect was ultimately subdued by several officers' collective use of physical force.  (A59-105,108) Once the suspect was restrained, he was transported to the hospital before being taken to jail.  (A59-105,108) At the hospital, medical staff asked the suspect if he had any complaints (referring to complaints of injuries from the use of force). (A59-105,108) The suspect's sole complaint was that an officer called him a "nigger" during the ride to the hospital.  (A59-105,108)  The irony of this story was that the suspect complained about the racial slur, but did not complain about any injuries from the use of force. (A59-105,108)  Lt. Rock quoted the racial slur for the sole purpose of illustrating that irony.  (A59-105,108)

In Turner's internal complaint, he conceded that the quotation was not directed to him.  (28)  In Turner's deposition, he further admitted it was the only time he ever heard Lt. Rock use that racial slur (Turner A225):

> **Q.**    **Other than that story, other than Mitch Rock quoting that racial slur in that story, were there any other times where he used that particular racial slur, the word "nigger"?**
> **A.**    **No.**
> **Q.**    **Not once other than that story?**
> **A.**    **That's correct, not once other than that story.**

## 2.    INSPECTOR WRIGHT'S INTERVIEW OF LT. ROCK

After the F squad officers responded to the questionnaires, Inspector Wright interviewed Lt. Rock. In that interview, Inspector Wright asked Lt. Rock about each of Turner's allegations. (A106-116) Lt. Rock admitted that he may have used the terms "mother f-–er" and "blank" during roll call, but never toward Turner or any other individual.  (A108)  Lt. Rock also admitted that he only quoted the above-mentioned racial slur once when relaying the ironic story about the arrestee.  (A108-109)  Lt. Rock stated that Turner never complained about any humiliating, embarrassing, racial, or disrespectful comments during his three years in F squad. (A108)

Lt. Rock did not recall telling Turner to "sit the f--- down and shut the f--- up", nor did Lt. Rock

recall "snatching" a clipboard from Turner's hands. (A109)  Lt. Rock did recall that Turner and his then-partner, Corporal Curry, said that they would not attend the 2003 Christmas party, to which Lt. Rock responded: "You two are f---ing up on and off the job." (A110) Lt. Rock explained that his response was stated in a jovial manner.  (A110)  Corporal Curry was not offended by the comment and he clearly understood its jovial context.  (Curry Aff. ¶¶3-4 - A18)

### 3.    INSPECTOR WRIGHT'S INTERVIEW OF TURNER

After interviewing Lt. Rock, Inspector Wright separately interviewed Turner. (A117-153)  In that interview, Inspector Wright inquired about each of Turner's allegations. (A117-153)  Turner recounted that Lt. Rock quoted a racial slur while telling the story of the African-American arrestee.  (A119)  Turner repeated his claim that Lt. Rock called him "mother f---er" and "blank" at various times, and he reiterated the clipboard incident. (A121)

Turner claimed that he confronted Lt. Rock on January 12, 2004, and explained that he was offended by Lt. Rock's behavior.  (A122)  Inspector Wright then asked Turner why he never complained to a higher authority (Captain Marlyn Dietz was Lt. Rock's supervisor).  (A122-123)  Turner explained that he never elevated his complaint because he did not believe it would be addressed.  (A122-123)

### 4.    THE WRITTEN REPRIMAND OF LT. ROCK FOR USE OF PROFANITY

At the conclusion of Inspector Wright's investigation, OPS reviewed the F squad officers' questionnaire responses, the follow-up statements by Curry and Lynch, and the transcripts of Inspector Wright's interviews of Lt. Rock and Turner. (A154-156)  Based upon OPS's review and Inspector Wright's recommendation, Lt. Rock was reprimanded for violating Directive 7.3(N), an internal police directive that proscribes rude and insulting language.  (A157)

### E.    TURNER'S COMMUTATION TO EARLY RETIREMENT

Meanwhile, after ten weeks of disability leave, Turner requested to return to full-time duty.  (A159)

It is the City's standard procedure that employees on disability may not return to full-time duty without clearance from a doctor. (A159) Dr. Raskin, the police psychiatrist, examined Turner to determine his fitness to return to full-time duty. (A160-162) Based upon that examination, Dr. Raskin opined that Turner should not return to duty because he had some mental health issues. (A160-162)

Turner sought a second opinion from his own selected mental health professional, Dr. Anderson. (A181) Upon her examination, Dr. Anderson concurred with Dr. Raskin's conclusion that Turner should not return to duty. (A181) Based upon the concurring opinions of these two mental health professionals, the Police Chief commuted Turner's disability leave to early retirement, in accordance with Section 39-126 of the City Pension Code. (A158) Section 39-126 gives the Police Chief authority to commute to early retirement any police officer who is no longer able to carry out the functions of the job.

F.    TURNER'S EEOC COMPLAINT

 On April 12, 2004, while Turner was still on disability leave but before his early retirement, he filed a complaint with the Equal Employment Opportunity Commission (EEOC). (A32-36) In his EEOC charge, Turner alleged three instances of purported discrimination: (1) Lt. Rock's use of racial slurs in the workplace; (2) Turner's transfer within F squad from the sixteenth district to the eleventh district; and (3) Turner's forthcoming (but unconsummated) transfer out of F squad. (A32) Turner alleged that the intra-squad transfer was due to his age, and that the transfer out of F squad was in retaliation for his internal complaint about Lt. Rock. (A32)

The City denied Turner's allegations. (A37-42) First, with regard to the racial slur, the City explained the context in which the racial slur was quoted to illustrate the irony of a story. (A39) Second, as to the intra-squad transfer, the City explained that it is an employer's prerogative to make lateral transfers that do not involve any change in rank, pay, job duties or scheduling. (A40-42) Third, as to the transfer out of F squad, it never materialized. (A42) Turner was absent on disability leave two weeks after the intra-squad transfer, and he remained on disability leave until his early retirement six months later. (A42) There

was never an opportunity to transfer Turner out of F squad.

The EEOC charge was administratively dismissed on March 31, 2005, without a finding of discrimination.  (A182)  On July 7, 2005, the EEOC issued a right-to-sue letter at Turner's request.  (A183)  Exactly ninety days thereafter, Turner instituted this civil action.  (A1-13)

---

## ARGUMENT

The City is entitled to judgment as a matter of law on all four counts in Turner's Complaint. First, Count I fails on its merits because Turner cannot establish all five required elements of a racially hostile work environment under Title VII. Second, Counts II and III, the federal and state age discrimination claims, respectively, fail on their merits because Turner cannot adduce any direct or indirect evidence to support his prima facie claim, nor can Turner rebut the City's non-discriminatory justification for its employment decision. Third, the retaliation claim in Count IV fails because the alleged retaliatory conduct occurred before Turner engaged in any protected activity, thereby ruling out the required causal nexus for retaliation.

Because there are no genuine issues of any material facts, the City is entitled to summary judgment on all four counts. An issue is only genuine when "a reasonable jury could possibly find in favor of the non-moving party with regard to that issue." *See EEOC v. Rite Aid Corp.*, 2005 U.S. Dist. LEXIS 32898,*2 (D. Del. 2005)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). A fact is only material if it affects the outcome of the lawsuit. *Id.* (citing *Anderson,* 477 U.S. at 248). This court has consistently reaffirmed that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Rite Aid Corp.,* 2005 U.S. Dist. LEXIS 32898, *1-2 (D. Del. 2005)(quoting Fed. R. Civ. P. 56(c)). To overcome summary judgment, the non-movant "must demonstrate the existence of a material fact supplying sufficient evidence – not mere allegations – for a reasonable jury to find for the non-movant." *See Poland v. Computer Sciences Corp.,* 2005 U.S. Dist. LEXIS 22618, *2 (D.Del. 2005). Turner's failure to meet this burden necessitates summary judgment for the City.

I.      THE CITY IS ENTITLED TO SUMMARY JUDGMENT FOR TURNER'S RACE-BASED TITLE
        VII CLAIM BECAUSE TURNER HAS FAILED TO ESTABLISH A RACIALLY HOSTILE WORK
        ENVIRONMENT  - COUNT I

_____Turner's hostile work environment claim fails because Turner has not suffered any intentional race-

based discrimination that was severe, pervasive, or objectively detrimental, nor can Turner establish

respondeat superior liability of the City.  A prima facie claim of a hostile work environment under Title VII

requires an employee to establish the following five elements: (1) the employee was subjected to intentional

discrimination due to race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally

affected the employee; (4) the discrimination would have detrimentally affected a reasonable person of the

employee's race; and (5) the employer is vicariously liable.  *See Tucker v. Merck & Co. Inc.*, 2005 U.S.App.

LEXIS 9087, *13 (3d Cir. 2005).  Turner's claim fails because he cannot establish all five above-listed

elements (although failure to establish even one element defeats his claim).  *See Aratesh v. MBNA*, 146 F.

Supp.2d 476, 493 (D.Del. 2001)(confirming that failure to establish any one of the five elements of a hostile

work environment defeats the entire Title VII claim).

        A.      TURNER   HAS   NOT   SUFFERED   ANY   INTENTIONAL RACE-BASED
                DISCRIMINATION

        With regard to the first prong, Turner has not suffered any intentional race-based discrimination.  In

*Persinger v. Delmar School District*, 2004 U.S.Dist. LEXIS 12805, *8 (D.Del. 2004), this court dismissed

a hostile work environment claim when the employee failed to establish intentional race-based discrimination.

Just like Turner, the employee in *Persinger* complained that a supervisor subjected her to "a continuing

campaign of discrimination and harassment."  *Id.*  While accepting the employee's allegation of a strained

relationship with her supervisor, the *Persinger* court nonetheless held that a strained relationship was not

proof of discrimination.  *Id.* at *12, n. 5.  The *Persinger* court reasoned that "unsupported, vague, and

conclusory allegations of discriminatory attitudes held by [the employee's supervisor] are not evidence of

intentional discrimination." *Id.* at *9.  Similarly, in *Jensen v. Potter*, 443 F.3d 445, 449 (3d Cir. 2006), the

Third Circuit explained that "if the reason for [the] harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief."

As in *Persinger* and *Jensen*, Turner's complaints of harassment are not tied to his race. Only one of Turner's five allegations involves a racial epithet (which Turner admits was not directed to him personally). (A28 & Turner A224-225) The remaining four allegations involve race-neutral profanity, some of which was directed to Caucasian employees as well as Turner. For reasons stated below, these allegations do not establish the race-based prong of a hostile work environment claim.

1.    THE SINGULAR QUOTATION OF THE RACIAL EPITHET

Turner's only race-based allegation is that Lt. Rock once quoted a racial epithet while telling a story in Turner's presence. (A28 & Turner A224-225) However, Turner admits that the epithet was not directed to him, nor was it used to describe him. (A28) The Third Circuit in *Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir. 2005)*,* held that an employee does not satisfy the first prong of a Title VII claim merely by citing to racially insensitive comments that were not directed to the employee. The *Caver* court reasoned that "[the employee] cannot show that the comments would not have been uttered or written but for *his* race if [the employee] was neither on the receiving end nor the subject of any comments." *Id.* at 262 (emphasis in original).

As in *Caver*, Turner admits that he was neither on the receiving end nor was he the subject of Lt. Rock's singular quotation of the racial epithet. (A28) Initially, Turner admitted in his internal complaint that Lt. Rock's quotation of the racial epithet was not directed to him. (A28) Turner again confirmed in his deposition that it was not directed to him. (Turner A224-225) Turner also admitted that this quotation was the only time he heard that racial epithet in the workplace. (Turner A224-225) Based on *Caver*, Lt. Rock's singular quotation of the racial epithet does not establish the first prong of Turner's hostile work environment claim.

-13-

2.    <u>RACIALLY NEUTRAL USE OF PROFANITY</u>

Aside from the quoted racial epithet, Turner's remaining allegations about Lt. Rock are race-neutral. (Pltf's Cmpl. ¶¶9-10, 12-13)  Turner merely alleges that Lt. Rock used profanity.  Profanity alone does not establish a hostile work environment because a Title VII plaintiff must establish that harassment is tied to the employee's membership in one of the protected classes enumerated in Title VII.  *See Jensen*, 443 F.3d at 449. This court has recognized that "[m]ere 'offhand comments and isolated incidents' are not sufficient to set forth a claim for a hostile work environment." *See Mack v. Greenville Ret. Cmty., LLC*, 2001 U.S. Dist. LEXIS 17427, \*10 (D. Del. 2001)(quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)).  As in *Mack*, Turner's allegations amount to nothing more than offhand comments and isolated incidents.

Applying *Jensen*, *Persinger* and *Mack,* Turner's Title VII claim fails because his complaints of harassment are not tied to his race.  (Pltf's Cmpl. ¶¶9-10, 12-13).  By Turner's own admission, his complaints involve racially neutral conduct directed to African-Americans and Caucasians alike (Turner A227):

> Q:    **. . . Have you ever seen [Lt. Rock] tease any other officers, give a hard time to any other officers?**
> A:    **Yes.**
> Q.    **White or black?**
> A.    **Both.**

An illustrative example of race-neutrality is Turner's complaint about Lt. Rock's "f---ing up on and off the job" comment.  (Pltf's Cmpl. ¶13)   Turner admits that this comment was also directed to his then-partner, Corporal Curry, who is Caucasian.  (Pltf's Cmpl. ¶13)

Based on these admissions, Turner's allegations about Lt. Rock (even if proven) are factually analogous to the employee's allegations to *Persinger*, 2004 U.S.Dist. LEXIS 12805, \*12, n.4.  In particular, the *Persinger* court observed that the employee's co-worker testified that their supervisor was abrasive toward employees of all races and genders.  *Id.* The *Persinger* court noted how this testimony actually proved the supervisor's abrasive behavior was not discriminatory.  *Id.*

Another illustrative example akin to *Persinger* is Turner's allegation that Lt. Rock was involved in

an altercation at the 2003 Christmas party. (Pltf's Cmpl. ¶13). Though Turner did not attend that Christmas party, he claims that Lt. Rock was involved in an altercation with two F squad officers, Rentz and Crawford. (A142-144) Lt. Rock, Rentz and Crawford denied this allegation during Inspector Wright's internal investigation. (A155) However, Turner discussed this allegation at length when Inspector Wright interviewed him. (A142-144) Turner reiterated this allegation again at length in his deposition. (Turner A229-231). Turner contends that the Christmas party altercation is an example of how Lt. Rock created a hostile work environment. (Pltf's Cmpl. ¶¶14 & 56) However, Crawford and Rentz are both Caucasian. Therefore, as in *Persinger,* Turner's claim about the altercation (if accepted as true) would actually disprove any racial animus in Lt. Rock's behavior.

Another of Turner's race-neutral complaints is the so-called "clipboard" incident. According to Turner, Lt. Rock snatched a clipboard from Turner's hand while addressing him with profanity. (Pltf's Cmpl. ¶12, Turner A17-18) Though Turner was offended by this incident, his African-American colleague, Alvin Boardley, described the incident as a joke. (A98) In fact, Boardley laughed at the incident. (A98) There cannot be any racial animus in an incident that evokes an African-American colleague's laughter.

Yet another of Turner's race-neutral allegations is that Lt. Rock allegedly told him to "sit the f--- down and shut the f--- up". Though two officers (Curry and Lynch) remember the comment, Turner cites no evidence of any racial animus in that comment. Even if Turner was personally offended, "the mere utterance of an epithet, joke, or inappropriate taunt that may cause offense is not actionable under Title VII." *See Paris v. Christiana Care*, 197 F. Supp. 28 111, 117 (D.Del. 2002).

Because Turner's above-described allegations are racially neutral, they cannot support the race-based prong of a hostile work environment claim. Turner's inability to meet this prong is sufficient grounds for summary judgment. *See Seabrook v. Gadow*, 2003 U.S.Dist. LEXIS 10096, *25(D.Del. 2003)("By failing to establish that he suffered from intentional discrimination because of his race or gender, plaintiff has failed to prove a prima facie case for hostile work environment."). Accordingly, this is the first of four reasons why

-15-

the City is entitled to summary judgment on Turner's Title VII claim.

     B.     THE CONDUCT AT ISSUE WAS NEITHER SEVERE NOR PERVASIVE

Another ground for summary judgment is Turner's failure to establish the second prong of a hostile work environment – the "severe or pervasive" prong.[3]    Proof of a hostile work environment requires that workplace conduct was so severe or pervasive as to alter the conditions of employment. *See Paris v. Christiana Care*, 197 F. Supp. 2d 111, 118 (D. Del. 2002)(dismissing a Title VII claim for failure to prove severe or pervasive conduct).    The Third Circuit has cautioned that the heightened "severe or pervasive" standard requires the courts to protect employers from unnecessary lawsuits from hypersensitive employees. *See Andrews v. City of Philadelphia*,  895 F.2d 1469,  1483 (3d Cir. 1990).  The Third Circuit in *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006), has illustrated that "[o]ccasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of plaintiff's employment."

Courts generally consider the following four non-dispositive factors when determining whether conduct is severe or pervasive: (1) frequency; (2) whether the conduct is physically threatening or humiliating; (3) unreasonable interference with work performance; and (4) effects on the employee's psychological well-being. *Id.*  For reasons set forth below, these four factors defeat the severe or pervasive element of Turner's Title VII claim.

     1.     INFREQUENCY

       With regard to frequency, Turner had minimal daily contact with Lt. Rock.    Lt. Rock was not Turner's direct supervisor; Lt. Rock was a mid-level supervisor.  (Turner A258 )  Turner and Lt. Rock only encountered each other once a week during roll call.  (Rock Aff. ¶3 - A54)    Roll calls are conducted by

---

[3]Earlier Third Circuit decisions label this prong as the "regular and pervasive" standard.  However, this Court in *Arasteh v. MBNA*, 146 F. Supp.2d 476, 494, n.36 (D.Del. 2001), confirmed that this prong has evolved into the "severe and pervasive" standard after the U.S. Supreme Court's pronouncement in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (U.S. 2001).

-16-

sergeants, not lieutenants.  (A190)  In *Paris,* this Court held that six incidents over the span of four months are not frequent enough to establish severe or pervasive conduct.  *See Paris,* 197 F. Supp.2d at 118.  In Turner's case, he points to merely four uses of race-neutral profanity at roll call during the three years he worked under Lt. Rock's indirect supervision.  Based on *Paris,* these scattered incidents (even if true) are too infrequent to be severe or pervasive.

Consistent with *Paris*, this court recognized in *Walker v. Pepsi-Cola Bottling Co.*, 2000 U.S. Dist. LEXIS 12635, *50 (D. Del. 2000), that "[o]ne-time utterances of racial epithets simply do not rise to the level of racial harassment."   The employee in *Walker* alleged that a manager referred to him with "racially offensive language."  *Id.*  The *Walker* court nonetheless dismissed the hostile work environment claim, reasoning that "the alleged racially offensive conduct must be pervasive and regular, not merely episodic[.]" *Id.*

Though *Walker* arose from a one-time utterance of a racial epithet, this court explained in *Kidd v. MBNA*, 224 F. Supp.2d 807, 814 (D. Del. 2002), that "[m]ore than a few isolated verbal incidents are necessary to establish that defendant is engaging in regular, pervasive discrimination that would detrimentally affect a reasonable person of the same race or sex in that position."  At issue in *Kidd* was an allegation that on two occasions an employer made disparaging comments about the plaintiff/employee's national origin. *Id.* at 813-814.  While accepting these allegations as true, the *Kidd* court nonetheless ruled that those incidents failed to establish severe or pervasive conduct.   *Id.*

Consistent with *Walker* and *Kidd*, this court also recognized  in *Bell v. Waste Management,* 2004 U.S. Dist. LEXIS 21864, *18 (D. Del. 2004), that "the single use of a racial epithet, no matter how egregious, is not pervasive and therefore does not, in isolation, create a hostile work environment."  In *Bell*, the hostile work environment claim was dismissed because the employee only established a single circumstance in which he was subject to a racial epithet.  *Id.* at *18-19.  While accepting as true that a co-worker addressed the employee with a racial slur, the *Bell* court reasoned that "because [the employee] has cited only a single

circumstance when he was subjected to a racial epithet, and because other materials that he complains of do not constitute a hostile work environment, his [Title VII] claim fails as a matter of law." *Id.* at *19. As in *Bell*, Turner's allegations consist of one quotation of a racial slur and four instances of race-neutral profanity.

The *Kidd*, *Walker* and *Bell* decisions confirm that Turner's allegations, even if proven, are not severe or pervasive enough to establish a hostile work environment. If a singular use of a racial slur did not establish a hostile work environment in *Walker*, even when directed to the plaintiff/employee, then Lt. Rock's mere quote does not support Turner's Title VII claim. If a singular use of a racial slur, coupled with complaints about race-neutral conduct, was not severe or pervasive enough to support the Title VII claim in *Bell*, then the sum of Turner's collective allegations is not severe or pervasive enough to support his Title VII claim.

## 2. LACK OF ANY PHYSICALLY THREATENING CONDUCT

As for physically threatening conduct, the *Paris* court explained that "although comments made were not in the best taste, at no point was [the employee] subject to any physical conduct that might reasonably be described as abusive or inappropriate." *Paris*, 197 F. Supp.2d at 118. The same is true of Turner's allegations about Lt. Rock. Not one of Turner's F squad colleagues identified any physically threatening conduct. (A59-105) On the contrary, as to Turner's allegation of the clipboard incident, Alvin Boardley stated that the entire incident was a joke. As another example, Corporal Curry described the tone of the "f-–ing up on and off duty" comment as jovial. (Curry Aff. ¶4 - A78) This court has recognized that "[o]rdinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing, are not actionable." *See Seldomridge v. Uni-Marts, Inc.*, 2001 U.S. Dist. LEXIS 9491 *30-31 (D. Del. 2001). Thus, Lt. Rock's profanity and occasional teasing are not enough to support Turner's Title VII claim.

## 3. INTERFERENCE WITH WORK PERFORMANCE

As for interference with work performance, the *Paris* court explained that even if an employer's comments cause an employee some distress, this factor only supports the "severe or pervasive" prong if a reasonable person in the employee's position would be so offended that he could not perform his job. *Paris*,

197 F.Supp. 2d at 117.    The exact opposite is true for Turner.  Turner claims he was doing a good job in the F squad.  (Pltf's Cmpl. ¶21) Thus, by Turner's own admission, Lt. Rock's conduct (even if proven) did not interfere with Turner's work performance.

           4.    TURNER'S PSYCHOLOGICAL WELL-BEING

With regard to Turner's psychological well-being, the U.S. Supreme Court in *Harris v. Forklift Sys. Inc*, 510 U.S. 17, 21 (1993), recognized that "while psychological harm, like any other relevant factor, may be taken into account, no single factor is required."  Consistent with *Harris*, this Court in *Seldomridge* observed that "a plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it interferes with job performance."  According to Dr. Raskin, the police psychiatrist, Turner's subjective feelings and personal reactions are that he "feels estranged and alienated, suspicious of others, and tends to blame them for his own problems." (A161)  Therefore, although Turner applied for stress-related disability leave, *Harris* and *Seldomridge* confirm that Turner's stress is a minor, non-dispositive factor in the comprehensive analysis of a hostile work environment.

The totality of the four above-cited factors, as applied to Turner's claim, fails to establish severe or pervasive conduct.  Summary judgment was granted for the employers in *Paris, Walker*, *Bell, Kidd* and *Seldomridge* because the employees in those cases failed to establish any conduct that was frequent, physically threatening or an unreasonable interference with work.  Because Turner has similarly failed to establish any severe or pervasive conduct, this is yet another reason why the City is entitled to summary judgment.

           C.    RACE-NEUTRAL PROFANITY WOULD NOT DETRIMENTALLY AFFECT A REASONABLE PERSON OF TURNER'S RACE.

The fourth prong of Turner's hostile work environment claim, the objective component, fails because Turner's allegations about race-neutral profanity (even if proven) would not detrimentally affect a reasonable person in Turner's position.  *See Harris,* 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment – an environment that a reasonable person would find

hostile or abusive – is beyond Title VII's purview."). Though Turner subjectively claims that Lt. Rock's alleged conduct offended him, Title VII liability turns on whether the conduct would be objectively detrimental to a reasonable person.

The U.S. Supreme Court in *Burlington v. White*, _ U.S. _, 126 S.Ct. 2405, 2415 (2006), has recently underscored the importance of objective standards in Title VII claims:

> We refer to reactions of a *reasonable* employee because we believe that [Title VII's anti-retaliation] provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.
>
> *Id.* at 2415(emphasis in original).

The objective component "further distinguishes Title VII from a generalized civility code." *See Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006). The *Jensen* court further cautioned that "[Title VII] does not mandate a happy workplace." *Id.*

Though Turner applied for stress-related disability leave, "the mere fact that the [employee] feels uncomfortable or considers [his] working environment unduly stressful is an insufficient basis for a constructive discharge claim." *Seldomridge*, 2001 U.S. Dist. LEXIS 9491, *37-38. The *Seldomridge* court reasoned that "the most unreasonably hypersensitive employee [is not] entitled to more protection than a reasonable employee." *Id.* at *23 (quotation omitted). The *Seldomridge* decision is consistent with the Third Circuit's admonition that trial courts must protect employers from Title VII lawsuits by hypersensitive employees. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1483 (3d Cir. 1990).

Turner's hypersensitivity is confirmed by Dr. Raskin, the police psychiatrist. (A160-162) Dr. Raskin examined Turner for medical clearance to return from disability leave to full-time duty. (A160-162) As part of that examination, Dr. Raskin administered the Minnesota Multi-phasic Personality Inventory 2 (MMPI-2) test. (A163-180) Based on the MMPI-2 test, Dr. Raskin diagnosed Turner with personality disorder. (A161) Specifically, Dr. Raskin identified the following personality profile of Turner: (1) histrionic, (2) paranoid, (3) immature, (4) impulsive, (5) angry, (6) hostile, and (7) hypersensitive to

rejection.  (A160-162)

Consistent with Dr. Raskin's diagnosis, Turner's hypersensitivity and paranoia are best illustrated by contrasting his colleague's reactions and perceptions in the same workplace.  As one example, Turner was offended by Lt. Rock's "f---ing up on and off the job" comment, but Corporal Curry (to whom the comment was also directed) perceived the comment as jovial.  (Curry Aff. ¶4 - A78)  As another example, Turner took offense to the so-called "clipboard" incident, whereas a fellow African-American officer, Alvin Boardley, described the incident as a joke.  (A98)  Most importantly, Turner's colleagues in F squad denied that Lt. Rock's conduct toward Turner was rude, humiliating, or threatening. (A59-105)   Thus, Turner's hypersensitive and paranoid reactions to the workplace, as contrasted with his colleagues' reactions to the same workplace, defeat the objective prong of Turner's hostile work environment claim.   Because a hostile work environment must be analyzed with objective standards, rather than through Turner's hypersensitive perceptions, this is yet another reason why the City is entitled to summary judgment.

### D.     TURNER CANNOT ESTABLISH THE CITY'S RESPONDEAT SUPERIOR LIABILITY

The fifth prong of Turner's hostile work environment claim fails because he cannot establish respondeat superior liability on the part of the City.  Respondeat superior liability under Title VII turns on whether the harasser is a supervisor or a co-worker.  *See Jensen v. Potter*, 435 F.3d 444, 452-453 (3d Cir. 2006). If a co-worker creates the hostile work environment, the employer is only liable if it knew or should have known about the harassment.  *Id.* at 453.  If a supervisor creates the hostile work environment, liability turns on whether the supervisor's acts are "official" or "unofficial."  *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004).

### 1.     RESPONDEAT SUPERIOR LIABILITY FOR CO-WORKER'S HARASSMENT

Turner's Title VII claim must be analyzed as a co-worker harassment case.  Although Lt. Rock held a higher rank than Turner, there were two levels of supervision above Lt. Rock in the Police Department (penultimately Captain Dietz and ultimately the Police Chief).  (Turner A258)  As a co-worker harassment

case, respondeat superior liability turns on whether the City "knew or should have known of the harassment and failed to take prompt remedial action." *See Trunzo v. Ass'n of Prop. Owners of the Hideout, Inc.,* 2004 U.S.App. LEXIS 1639, *10 (3d Cir. 2004). In *Trunzo*, the employee first complained about alleged harassment on June 24, 1999. *Id.* at *4. The employee in *Trunzo* could not cite any incidents of harassment that occurred after that date. *Id.* at *6. Accordingly, the Third Circuit in *Trunzo* held that the employee did not establish respondeat superior liability because no acts of harassment occurred after her employer knew or had reason to know of her complaint. *See also Kunin v. Sears Roebuck & Co.*, 175 F.3d 289 (3d Cir. 1999)(dismissing an employee's Title VII claim for failure to show actual or constructive notice of harassment).

As in *Trunzo* and *Kunin,* the timing of Turner's complaint defeats respondeat superior liability. Turner submitted his internal complaint on January 26. Turner admits that prior to January 26 he did not elevate his complaint to a higher supervisor, such as Captain Dietz or the Police Chief (Turner A258):

> **Q:** **. . . [P]rior to submitting [the internal complaint], did you ever complain about Lieutenant Rock's treatment of you?**
> **A:** **To him, yes.**
> **Q:** **To anyone other than Lieutenant Rock?**
> **A:** **No.**

January 26, 2004, was the first date when the City knew or had reason to know of Turner's complaints about Lt. Rock. Therefore, the City cannot be vicariously liable for any of Turner's allegations that occurred prior to January 26.

An employer is not vicariously liable for a hostile work environment if it proves "both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of [Title VII-based] harassment, and (2) that the [employee] unreasonably failed to avail [himself] of that employer-provided preventative or remedial apparatus." *Suders*, 542 U.S. at 134. Consistent with *Suders*, the City's Police Department implemented a policy for reporting and resolving complaints of workplace harassment. (A191-

-22-

196) Specifically, workplace harassment was expressly proscribed by internal police directive 6.78. (A191-196) The Office of Professional Standards ("OPS") was charged with investigating any violations of internal directives, including directive 6.78. (A191-196) Also as in *Suders*, Turner unreasonably failed to avail himself of these employer-provided remedial options until January 26, 2004.

Once Turner lodged his internal complaint on January 26, OPS initiated the above-described remedial procedures, which included detailed questionnaires to Turner's colleagues, as well as extensive interviews of Turner and Lt. Rock. These remedial procedures ultimately led to Lt. Rock being reprimanded for use of profanity. Turner admits that all of his allegations about Lt. Rock occurred prior to January 26 (Turner A257-259):

> **Q:** **So after January 26, 2004, after complaining about [Lt. Rock], what contact did you have with Lieutenant Rock?**
> **A:** **I didn't.**

Turner does not allege that any harassment occurred after January 26. Consequently, based on *Suders*, *Trunzo*, and *Kunin*, none of Turner's allegations establishes respondeat superior liability for co-worker harassment. Because respondeat superior liability is the indispensable fifth element of a hostile work environment claim, its absence is another reason why the City is entitled to summary judgment.

## 2.    RESPONDEAT SUPERIOR LIABILITY FOR SUPERVISOR'S HARASSMENT

Alternatively, even if Lt. Rock were deemed Turner's supervisor, as opposed to Turner's co-worker,[4] respondeat superior liability remains absent because the alleged harassment (race-neutral profanity) is comprised of "unofficial" acts that do not constitute a tangible employment action. "If supervisors create the hostile environment, an affirmative defense may be available where there is no tangible employment action." *See Jensen*, 435 F.3d at 444 (citing the *Ellerth/Faragher* defense). *See also Ellerth v. Burlington Indus.*, 524 U.S. 742 (1998)*; Faragher v. City of Boca Ratan*, 524 U.S. 775 (1998). When the employer raises

---

[4]The City does not concede that this case falls within the supervisor harassment category of the respondeat superior liability. The City merely offers this argument as an alternative if the Court does not agree that this is a co-worker harassment case.

this affirmative defense (Def's Ans. ¶88), the employer is only liable if the plaintiff/employee establishes that the supervisor's conduct constituted an "official act" of the employer (hence, a tangible employment action).  *See Suders*, 542 U.S. at 150.

By illustration, the *Suders* Court explained that inappropriate sexual comments giving rise to a Title VII claim would be examples of "unofficial acts", and would therefore be insufficient for respondeat superior liability in a supervisor harassment claim.  *Id.* at 150.  Because those unofficial acts involve no direct exercise of the employer's authority, the *Suders* Court reasoned that such acts are "exactly the kind of wholly unauthorized conduct for which the [tangible employment action] defense was designed."  *Id.*  In contrast, examples of "official" acts would be demotions, reductions in compensation, or other acts in which the supervisor uses his managerial or controlling position to the employee's disadvantage.  *Id.* at 148.

The distinction between official and unofficial acts recognizes that "there are acts of harassment which a supervisor might commit which might be the same acts a co-employee would commit, and there may be some circumstances in which the supervisor's status makes little difference."  *Id.* at 145.   Applying this distinction to Turner's claim, his allegations of Lt. Rock's race-neutral profanity involve "unofficial" acts.  They do not arise from a misuse of Lt. Rock's managerial authority.  Rather, they are acts of harassment that could have been inflicted just as easily by a co-worker.  As unofficial acts, they do not establish respondeat superior liability in a supervisor harassment case.  *Id.* at 150.  Absence of respondeat superior liability is another reason why the City is entitled to summary judgment.

-24-

II.    THE CITY IS ENTITLED TO SUMMARY JUDGMENT FOR TURNER'S AGE DISCRIMINATION CLAIMS BECAUSE TURNER HAS FAILED TO ADDUCE EITHER DIRECT EVIDENCE UNDER THE *PRICE WATERHOUSE* TEST OR INDIRECT EVIDENCE UNDER THE *MCDONNELL DOUGLAS* TEST, AND THE CITY HAS NONETHELESS ADDUCED AN IRREBUTTABLE NON-DISCRIMINATORY REASON FOR ITS EMPLOYMENT DECISION - COUNTS II & III[5]

Turner's age discrimination claim fails because he cannot adduce any direct evidence under the *Price Waterhouse* test or any indirect evidence under the *McDonnell Douglas* test, nor can he rebut the City's non-discriminatory reason for transferring him to the eleventh district. *See Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989); *McDonnell Douglas Corp. v. Green*, 411 U.S.792 (1973). Age discrimination claims are analyzed in one of two ways: (1) the *Price Waterhouse* burden-shifting framework is applied for "direct evidence" cases; or (2) the *McDonnell Douglas* burden-shifting framework is applied for "indirect evidence" cases. *See Peace v. Shellhorn & Hill, Inc.*, 2005 U.S. Dist. LEXIS 2533, *8-10 (D. Del. 2005). For the reasons below, Turner cannot meet either of these burdens.

A.    TURNER'S FAILURE TO MEET THE *PRICE WATERHOUSE* STANDARD FOR "DIRECT EVIDENCE" CASES

Turner cannot prove age discrimination under the *Price Waterhouse* test because there is no admissible, direct evidence that Turner's age was a factor in transferring him to the eleventh district. The *Price Waterhouse* test defines direct evidence as "sufficient to allow a jury to find that the decision-makers placed a substantial reliance on the plaintiff's age in reaching their decision." *See Glanzman v. Metropolitan Mgmt. Corp.,* 391 F.3d 506, 512 (3d Cir. 2004). Turner's only "direct" evidence is his allegation that Sgt. Jones said that Lt. Rock and Sgt. Staats said that they wanted a "younger, more aggressive" officer in the sixteenth district. (Pltf's Cmpl.¶ 16) This double hearsay statement is the only "direct" evidence that Turner relies upon. Sgt. Jones denied this statement in the City's EEOC response. (A41)

Turner's allegation about Jones's statement would not be admissible at trial because it is hearsay

---

[5]Because the elements of an age discrimination claim are identical under the federal ADEA and DDEA, this Opening Brief addresses Counts II and III collectively on the merits. See *DuPont Country Club v. Delaware DOL*, 1986 Del.Super. LEXIS 1076, *3-4 (1986)(confirming that the prima facie case of age discrimination under state law is modeled upon the federal ADEA).

within hearsay.  See Fed. R. Evid. 805.  Turner cannot testify as to Jones's out-of-court statement.  See Fed. R. Evid 801(c) & 802.  Even if Jones admitted to this statement, Jones cannot testify as to Lt. Rock's or Sgt. Staats's out-of-court statements.  See Fed.R.Evid. 802.

Turner's unsupported hearsay allegation about Sgt. Jones does not create a genuine dispute that would preclude summary judgment.  As the non-movant, Rule 56(e) specifically precludes Turner from resting upon the mere allegations in his pleading.  Rather, Rule 56(e) mandates that Turner must adduce admissible evidence of a disputed material fact.  Therefore, Turner's "hearsay within hearsay" allegation is not admissible evidence to satisfy the *Price Waterhouse* burden of proof, see Fed. R. Evid. 805, nor is it sufficient evidence to meet Turner's Rule 56(e) burden of moving beyond the allegations of his pleading.

B.    TURNER'S FAILURE TO MEET THE *MCDONNELL DOUGLAS* STANDARD FOR "INDIRECT EVIDENCE" CASES

Alternatively, Turner's claim would also fail the *McDonnell Douglas* test if he relied upon indirect evidence of age discrimination.  *McDonnell Douglas* imposes upon the employee an initial burden of "establishing a prima facie case of unlawful discrimination." *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (quoting *McDonnell Douglas*, 411 U.S. at 802). This initial burden requires the employee to establish the following four elements: (1) he was at all relevant times over the age of forty; (2) he is qualified for the job that he seeks; (3) he suffered an adverse employment decision; and (4) similarly situated employees under the age of forty were treated more favorably. *See Lyle v. Phila. Gas Works,* 2005 U.S. App. LEXIS 22260, *3-4 (3d Cir. 2005).

Turner claims that his age was a factor in switching his patrol district with Fray Lynch's district. (Plts. Cmpl. ¶60)  The City concedes that Turner is a member of the ADEA's protected class, given that his fortieth birthday was two days before he and Lynch switched districts.  However, an ADEA plaintiff can only survive summary judgment by adducing evidence "sufficient to convince a reasonable fact-finder to find all of the elements of [the] prima facie case." *See Duff v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001). For reasons set forth below, Turner's claim fails to satisfy the remaining three elements of the ADEA.

1.     TURNER'S LACK OF QUALIFICATIONS FOR THE JOB HE SEEKS

Turner's claim fails the second ADEA prong because he was not qualified to remain in the sixteenth district. That particular district was under heightened scrutiny from the U.S. Attorney's Office because the federal government funded the salaries of two officers. (Staats Aff. ¶3-4 -A57) For that reason, Sgt. Staats had to attend monthly meetings with the U.S. Attorney's Office to report the performance trends of that district. (Staats Aff. ¶5 - A57) That is why Sgt. Staats needed officers who were self-motivated and able to perform self-initiated activities. (Staats Aff. ¶6 - A58) Lynch was selected to switch with Turner precisely because she was more self-motivated and more capable of performing self-initiated activities. (Staats Aff. ¶7 -A58)

Although Turner had ten more years on the police force than Lynch, the Third Circuit has recognized that an employee's years of service do not automatically make him more qualified than someone with less years of service. *See Snik v. Verizon Wireless*, 2005 U.S.App. LEXIS 28314, *10-11 (3d Cir. 2005). Therefore, despite his seniority Turner cannot satisfy the second prong of the ADEA because he was not the most qualified for the sixteenth district, particularly when that district was under heightened scrutiny from the U.S. Attorney's Office.

2.     TURNER'S FAILURE TO IDENTIFY AN ADVERSE EMPLOYMENT ACTION

As for the third ADEA prong, switching Turner from one patrol district to another is not an adverse employment action. Generally, a purely lateral transfer does not constitute an adverse employment decision under the ADEA. *See Fallon v. Meissner*, 2003 U.S. App. LEXIS 8277, *8 (3d Cir. 2003). By Turner's own admission, the intra-squad transfer did not change his rank, pay, work schedule or job duties. (Turner A220-221) The only changes were a new patrol partner (Gifford), a new supervisor (Sgt. Jones), and a new patrol area (East Wilmington). Turner admits that he had no preference for one district over the other. (Turner A234)

In limited circumstances (not applicable here), a lateral transfer to a dead-end job can be an adverse action, even when it does not cause a loss in pay or benefits. *Id.* at *8-9. However, in those limited circumstances, the adverse action must arise not from the employee's individual preference, but from the job itself. *Id.* at *9-10. In *Fallon*, the employee was transferred from one branch office to another. *Id.* at *9. The employee objected to the transfer because the new branch office would require a longer commute from his home. *Id.* at *9-10. The *Fallon* court reasoned that "a materially adverse employment action . . . must not arise from the employee's individual preferences, [but] must be 'job-related' in the appropriate sense." Because the employee's dissatisfaction was not job-related, but instead arose from his individual preference, the *Fallon* court held that it did not meet the third prong of the ADEA. *Id.* at *9-10.

In contrast to *Fallon*, an example of a job-related adverse change is a lateral transfer to an undesirable workshift. *See Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 787 (3d Cir. 1998). Another job-related example is laterally transferring an employee to a job that he cannot perform. *See DiIenno v. Goodwill Indus.*, 162 F.3d 235, 236 (3d Cir. 1998).

Turner's objection to the eleventh district was not job-related. Unlike *Mondzelewski*, Turner admitted the intra-squad transfer did not change his schedule or other working conditions. (A 207) Turner also acknowledged that he "didn't have a problem working in the different areas from 16 to 11 district." (Turner A236) Unlike *DiIenno*, Turner admitted that he is quite capable of patrolling that district again. (A208)

Turner's objection to the eleventh district stems from his personal preference for the sixteenth district, just like the employee's preference for a particular branch office in *Fallon*. A City police officer's job is to protect and serve all citizens of Wilmington, not just citizens that live in certain neighborhoods. Therefore, *Fallon* dictates that the City's refusal to accommodate Turner's personal preference is not an adverse employment decision for the third prong of an ADEA claim.

3.   TURNER'S INABILITY TO PROVE THAT HE WAS TREATED ANY DIFFERENTLY THAN SIMILARLY SITUATED POLICE OFFICERS UNDER THE AGE OF FORTY

Lastly, Turner's claim fails the fourth ADEA prong, the "similarly situated" component, because Turner was not treated differently than other police officers under the age of forty. Admittedly, Turner was switched with Lynch, who is younger than Turner. However, that alone does not satisfy the "similarly situated" prong of the ADEA. The Third Circuit in *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004), firmly cautioned against construing the ADEA as a bumping statute that would guarantee employment to protected workers at the expense of younger workers. Based on *Monaco*, the ADEA cannot confer upon Turner any bumping rights over Lynch's assignment to the sixteenth district. Rather, it is a supervisor's prerogative to rotate patrol officers among geographic districts so that Lynch and other officers can gain experience patrolling other areas of the City.

Because patrol officers are routinely rotated among geographic patrol districts, the "similarly situated" prong requires Turner to show not merely that he is as qualified as Lynch, but that he was treated ***differently than*** officers under the age of forty. Most ADEA cases apply this prong when an older worker was terminated and replaced by a younger worker. *See e.g., Peace v. Shellhorn & Hill, Inc.,* 2005 U.S. Dis. LEXIS 2533 (D.Del. 2005). In Turner's case, he was not replaced by Lynch. Turner and Lynch merely switched geographic districts within F squad. After Lynch and Turner switched districts, several F squad officers under the age of forty continued to patrol outside of the sixteenth district. (Henry Aff. ¶5 - A50-51) That is why Turner was not treated any differently than Lynch or other officers under the age of forty. Thus, Turner's age discrimination claim fails the fourth ADEA prong.

C.   THE CITY'S IRREBUTTABLE, NON-DISCRIMINATORY REASON FOR THE INTRA-SQUAD TRANSFER

Even if Turner could adduce direct evidence under the *Price Waterhouse* test or indirect evidence under the *McDonnell Douglas* test, his age discrimination claim would nonetheless fail because he cannot rebut the City's non-discriminatory reason for the intra-squad transfer. *See Glanzman v. Metropolitan Mgmt.*

*Corp.*, 391 F.3d 506, 514 (3d Cir. 2004)(applying the *Price Waterhouse* test to require the ADEA plaintiff to rebut the employer's non-discriminatory reason for the employment decision); *Bernhard v. Nexstar Broad. Group, Inc.*, 146 Fed. Appx. 582, 584 (3d Cir. 2005)(applying the *McDonnell Douglas* burden-shifting framework to an ADEA claim). Once the employer articulates a non-discriminatory reason, the employee can only defeat summary judgment by proffering "some evidence from which a fact finder could reasonably disbelieve the proffered reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

The non-discriminatory reason for Turner's transfer was the sixteenth district's need for a patrol officer who would be self-motivated and able to perform self-initiated activity. (Staats Aff. ¶7 - A58) Because that district's performance was under heightened scrutiny from the federal government, Sgt. Staats rotated Turner with Lynch. (Staats Aff. ¶4, 5 &7 - A57-58) Thus, Turner was transferred out of the sixteenth district not because of his age, but because he was not as self-motivated as Lynch.

In light of this non-discriminatory reason, Turner bears the burden of either disproving the City's reason or proving that age was nonetheless a motivating or determining factor. *See Lyles v. Phila Gas Works*, 2005 U.S. App. LEXIS 22260, *4-5 (3d Cir. 2005). Turner cannot meet this burden by simply citing the age difference between Lynch and him. This court in *Peace v. Shellhorn & Hill, Inc.,* 2005 U.S. Dis. LEXIS 2533, *24 (D.Del. 2005), held that an ADEA plaintiff's replacement by a younger employee, without more, does not support an inference of discrimination. Nor can Turner meet this burden by citing the adequacy of his job performance. The *Peace* court also cautioned that a plaintiff/employee's competent performance of his job does not support an inference of discrimination under the ADEA. *Id.* at *24. Admittedly, the City's goal was to switch Turner with a more aggressive officer. However, in the ADEA context, the Third Circuit has confirmed that "aggressive" is not synonymous with "youth." *See Snik v. Verizon Wireless*, 2005 U.S. App. LEXIS 28314, *8-9 (3d Cir. 2005). Thus, Turner's age difference, the adequacy of his job

performance, and the City's preference for aggressive officers are all insufficient factors to support an inference of age discrimination.

The age demographics of the entire F squad also belie any inference of age discrimination. There were a total of sixteen officers in F squad. Three of those officers were born in 1964 (the same year as Turner), three were born before 1964, and ten were born after 1964. (Henry Aff. ¶5 - A50-51) Turner's patrol partner in the eleventh district, Gifford, is six years younger than Turner. (Henry Aff. ¶5 - A50-57) Turner's former patrol partner, Corporal Curry, is older than Turner and he remained in the sixteenth district until the summer of 2004. (Curry Aff. ¶2 - A78 ) Thus, there were officers over and under the age of forty in both districts of F squad. This rules out age as a factor in switching Turner's and Lynch's respective districts. *See Peace*, 2005 U.S. Dist. 2533, *23-24 (considering the employer's overall age demographics when dismissing an ADEA claim). Consequently, because Turner cannot establish a discriminatory reason for the intra-squad transfer, his ADEA claim fails to meet the ultimate burden of production under *Price Waterhouse* as well as *McDonnell Douglas*.

III.    THE CITY IS ENTITLED TO SUMMARY JUDGMENT FOR TURNER'S RETALIATION CLAIM BECAUSE TURNER CANNOT ESTABLISH A PRIMA FACIE CLAIM UNDER *MCDONNELL DOUGLAS*, NOR CAN HE REBUT THE CITY'S NON-DISCRIMINATORY JUSTIFICATION FOR ITS EMPLOYMENT DECISION- COUNT IV

Turner's retaliation claim fails because he cannot meet the tripartite *McDonnell Douglas* burden of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S 792, 802 (1973). *See McDonnell Douglas* imposes three prongs upon the employee for a prima facie case of retaliation: (1) the employee engaged in protected activity; (2) the employer took an adverse employment action against the employee; and (3) there is a causal nexus between the protected activity and the adverse employment action. *Id.* "Whether [the employee] has established a prima facie case of retaliation is a question of law for the court." *See Baker v. Wilmington Trust Co.*, 320 F. Supp.2d 196, 200 (D.Del. 2004).

If a retaliation plaintiff satisfies these three prima facie prongs (which Turner cannot), the employer must then demonstrate "a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 799. Once the employer proffers a non-discriminatory reason, the ultimate burden shifts back to the employee, who is then obligated to disprove the employer's proffered justification. *Id.*

Turner's retaliation claim fails the *McDonnell Douglas* test for three reasons. First, Turner's lateral transfer from one squad to another is not an adverse employment action. Second, the lateral transfer was recommended <u>before</u> Turner engaged in any protected activity. Third, Turner cannot rebut the City's non-discriminatory reason for the lateral transfer.

A.    TURNER'S FAILURE TO ESTABLISH THE PRIMA FACIE CLAIM

According to Turner's EEOC charge (A32-36), he engaged in the protected activity of lodging an internal race discrimination complaint against Lt. Rock on January 26, 2004. (A28-31) The City concedes that Turner's complaint (albeit unsubstantiated) qualifies as protected activity under the first *McDonnell Douglas* prong**.** *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). Turner's retaliation claim nonetheless fails because he cannot establish the remaining two prongs: an adverse employment action and a causal nexus between the employment action and the protected activity.

-32-

1.    <u>LACK OF ADVERSE EMPLOYMENT ACTION</u>

As for the second prong of *McDonnell Douglas*, Turner's EEOC charge alleges that his forthcoming (but unconsummated) transfer out of F squad to regular patrol was an adverse employment action. (A32-36) However, Turner admitted that his transfer would not have caused a change in salary, rank, shift, or job duties. (Turner A235-236)  The only changes would be a different patrol partner and a different supervisor, Lt. Battaglia.[8]  (A208)  Thus, by Turner's own admission, there was nothing adverse about this transfer.

Though Turner questioned the transfer, this court has recognized in *Poland v. Computer Sciences Corp.,*2005 U.S. Dist. LEXIS 22618, *18-19 (D. Del. 2005)(quoation omitted), that "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Instead, "retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *See Caver v. City of Trenton*, 420 F.3d 243, 255 (3d Cir. 2005).  Turner himself admits that he "had no problem" working in the patrol division under Lt. Battaglia. (A208)    In light of this admission, Turner cannot claim that the transfer now constitutes an adverse employment action.

More importantly, Turner admits that the transfer never actually occurred.  (Turner A233-234)  It was recommended on January 22, along with the transfers of three other officers. (A56)  However, Turner continued to work in F squad until January 26, the date he began his disability leave.  There cannot be anything adverse about a lateral transfer that never occurred.  Thus, Turner fails to meet the second prong of *McDonnell Douglas*.

---

[8]Turner's Complaint attempts to overlap his hostile work environment and retaliation claims.  (Pltf's Cmpl. ¶ 69(b)).  Though both claims arise from Title VII, the U.S. Supreme Court instructs that "the [retaliation] standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *See Burlington v. White*, __ U.S.__, 126, S.Ct. 2405, 2416 (2006).  Thus, Turner's allegations about a hostile work environment in Count I are not proper considerations for his retaliation claim in Count IV.

2.      LACK OF A CAUSAL NEXUS

Assuming *arguendo* that the unconsummated transfer would be an adverse employment action, Turner still cannot establish the third *McDonnel Douglas* prong, which is the causal link between the internal complaint and the transfer.  Lt. Rock recommended the transfer on January 22 (A56), which was four days before Turner lodged his internal complaint on January 26. (A28-31)  The allegedly adverse action occurred before Turner engaged in any protected conduct.  This sequence rules out any causal nexus for the third prong of *McDonnell Douglas.*

B.      THE NON-DISCRIMINATORY JUSTIFICATION FOR THE EMPLOYMENT DECISION

Even if Turner could meet the three prongs for retaliation (which he cannot), the City's non-discriminatory justification was Turner's sub-standard performance in F squad.  The Third Circuit has held that a retaliation defendant's burden is satisfied "if it introduces evidence which, if taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision."  *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).  "The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff."  *Fuentes*, 32 F.3d at 763.

Turner's substandard performance is best illustrated by his former F squad partner, Corporal Curry.  According to Curry, Turner failed to assist him when they were conducting drug surveillance.  (Curry Aff. ¶5 - A78-79)  On one particular occasion, Curry was conducting drug surveillance from a citizen's private residence.  (A78-79) When he identified a drug transaction, he called Turner with the location two drug dealers.  (A78-79) Turner was nowhere to be found.  Another officer initiated a foot chase of one suspect.  (A78-79) As that other officer chased the suspect, Turner rode by in his squad care and kept going.  (A78-79)  The end result was that the suspects escaped and no arrests were made. (A78-79)

-34-

Turner's tendency to abandon his partners was further illustrated by another former F squad partner, Michael Gifford. Gifford and Turner were patrol partners for one week in January of 2004. (Gifford Aff.¶6 - A80) During that week, they completed a major drug raid. (Gifford Aff.¶ 7 - A81) After the raid, Turner abandoned Gifford when he was told to get the arrest numbers and to fingerprint the suspects. (Gifford Aff.¶ 7 - A81) Rather than assist with the arrest and fingerprinting of the suspects, Turner left the police station. (Gifford Aff.¶ 7 - A81) Gifford confronted Turner about his abandonment the next day. (Gifford Aff.¶ 7 - A81)

Turner abandoned two F squad partners in a row. That is a legitimate non-discriminatory reason for transferring an officer out of F squad, particularly when Sgt. Staats identified a more motivated replacement (Lynch). In light of this non-discriminatory justification for the transfer, the burden of persuasion shifts back to Turner. *See McDonnell Douglas*, 411 U.S. at 802. Turner cannot meet this ultimate burden without adducing "evidence from which a reasonable fact finder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination." *See Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1996). This burden requires "some evidence, direct or circumstantial, from which a fact finder could either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. "This is a more onerous burden of persuasion for a retaliation plaintiff, in that it turns the inquiry 'from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced.'" *Hicks v. St. Mary's Honor Ctr.*, 509 U.S. 502, 516 (1993).

Turner cannot meet this burden of persuasion because the record is devoid of any evidence even suggesting that the City acted in a retaliatory manner. As Turner cannot meet the *McDonnell Douglas* burden of proof, the City is entitled to summary judgment for the retaliation claim.

## CONCLUSION

For the reasons set forth above, Defendant, City of Wilmington, respectfully moves this Honorable

Court to grant its motion for summary judgment on all four counts of the Complaint.

/s/ Alex J. Mili, Jr.
Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendant City of Wilmington

September 1, 2006

-36-