IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EVERETT D. TURNER,                          :
                                            :
        Plaintiff,                          :        C.A. NO. 05-716 (GMS)
                                            :
        v.                                  :
                                            :        JURY TRIAL DEMANDED
CITY OF WILMINGTON,                         :
                                            :
        Defendant.                          :

**PLAINTIFF'S ANSWERING BRIEF**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Jeffrey K. Martin, Esquire (DE-2407)
MARGOLIS EDELSTEIN
1509 Gilpin Avenue
Wilmington, DE  19806
(302) 777-4680
Attorneys for Plaintiff

Dated:  September 18, 2006

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................................... ii

NATURE AND STAGE OF PROCEEDINGS ............................................................. 1

STATEMENT OF FACTS ........................................................................................... 3

ARGUMENT ............................................................................................................. 15

I.      THE EXISTENCE OF GENERAL ISSUES OF MATERIAL FACT
MUST PRECLUDE SUMMARY JUDGMENT........................................... 15

II.     PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CLAIM OF
RACIAL DISCRIMINATION BY WAY OF HOSTILE WORK
ENVIRONMENT. ....................................................................................... 21

III.    PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CASE FOR
RETALIATION............................................................................................ 25

CONCLUSION.......................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 255 (1986) ...................................................................................... 20

*Hampton v. Bureau of Tinton Falls Police Department,*
    98 F.3d 107, 115-116 (3d Cir. 1996). .................................................................. 26

*Horowitz v. Fed. Kemper Life Assurance Co.,*
    57 F.3d 300, 302 n.1 (3d Cir. 1995). .................................................................. 20

*Kachmar v. SunGard Data Systems, Inc.,*
    109 F.3d 173 (3d Cir. 1999)................................................................................. 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)................ 20-21

*McDonnell-Douglas v. Green,*
    411 U.S. 792 (1973)............................................................................................. 24

*Pa. Coal Ass'n v. Babbitt,*
    63 F.3d 231, 236 (3d Cir. 1995) .......................................................................... 21

*Pennsylvania State Police v. Suders,*
    542 U.S. 129, 134 (2004)..................................................................................... 20

## Unreported Decisions

*Seldomridge v. Uni-Marts, Inc.,*
    2001 U.S. Dist. LEXIS 9491 (D. Del. 2001) ........................................................ 21

*Zelinski v. Pennsylvania State Police*
    2004 U.S. App. LEXIS 21235 (3d Cir. 2004)........................................................ 23

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff concurs with Defendant's Statement of the Nature and Stage of the Proceedings with the following exceptions. Plaintiff agrees to voluntarily dismiss the age discrimination claim and, in turn, focus on the racial discrimination and retaliation claims.

Plaintiff was unable to take any deposition discovery because Plaintiff was out of state on the west coast accompanying his wife on a business trip which began in June and ended in August. Plaintiff is not claiming any prejudice in being unable to complete any depositions. On the contrary, Plaintiff believes that the factual record is fully developed to the extent that Defendant produced all of the written documentation that was responsive to the Rule 26 Initial Disclosures. As will be developed in the Argument, *infra*, Plaintiff believes that Defendant did not produce all documents required to be disclosed under Rule 26.

Indeed, pages A-154 to A-157 (Inspector Wright's report of the Internal Investigation and the Memorandum from Captain Dietz to Inspector Wright regarding summary punishment of Lt. Rock) were produced in Defendant's Appendix but were never produced by way of Defendant's document production pursuant to Defendant's Initial Disclosures. In addition, it appears that Defendant did not produce the Internal Investigation Questionnaires from Officers Lynch, Curry, Crawford and Rentz, all of whom had direct knowledge of the matters being inquired into by way of the questionnaires.

Plaintiff objects to the use of Defendant's unverified statements to form a defense to Plaintiff's allegations. Specifically, Defendant produced Internal Investigation

Questionnaires from Officers Boardley, Connor and Harvey (A-96 through A-105), and the transcript of Mitchell Rock's interview. (A-107 through A-116). These items have not been verified but were cited in various forms in Defendant's Opening Brief.

This is Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary Judgment.

## STATEMENT OF FACTS

Plaintiff Everett Turner ("Plaintiff" or "Turner") served as a City of Wilmington Police Officer from November 13, 1989 through his medical discharge in July 2005. His rank at the time of his separation from the Wilmington Police Department ("WPD") was corporal. (A-1 through A-13).

In the mid-part of 2001, Plaintiff was reassigned to F Platoon. (A-118). In this capacity, he served as a community police officer primarily in an area of west Wilmington that was known by the federal agents as the "Weed and Seed" area because of extensive drug problems. (A-2). Turner found his niche in community policing and the community that he served appreciated his efforts. (A-29). F Platoon was the only platoon in WPD that provided community policing. (A-234). During his work in west center city with F Platoon, he received numerous awards and resolutions regarding his efforts in the community. (A-29).

Turner continued work in F Platoon until the time he was last on active duty, January 26, 2004.[1] (Tab L). Although Turner never returned to active duty, he was alerted that WPD management had agreed in early February 2004 to transfer him out of F Platoon. (Tab J).

Throughout Plaintiff's work in F Platoon from mid-2001 through January 2004, a period of approximately 2 1/2 years, Lt. Mitchell Rock (hereinafter "Lt. Rock" or "Rock") served as the Operations Supervisor for F Platoon. (Tab A). Plaintiff had frequent meetings with Lt. Rock approximately eight to ten times per week over this time period. (Tab A). Except for a short period of time when Turner initially worked under

---

[1] (Tab __) refers to Plaintiff's Appendix to this Answering Brief in Opposition to Summary Judgment which has been filed contemporaneously with the Brief but is separately bound.

Rock, Rock did not refer to Turner by his given name; rather, Turner was continually referred to by Rock as "motherfucker", "motherfucking 'blank'" or "dumbass". (Tabs A, C).

Plaintiff was very insulted by Rock's words of greeting and frequently advised Rock that this bothered him and asked if he could please refrain from using such words. (Tab A; A-125). During the last three months of Turner's active duty, there were three occasions that Turner asked him to desist (two in November and one in December). (Tab A). Rock's response to Plaintiff's request was "yeah, motherfucker, right" and he walked away. (Tab A).

The term "blank" was introduced to the WPD by Corporal Eric Green some time in the late 90's. (Tab B). The term was to substitute for the "n" word such that a black officer could use that with regard to another black officer without using the "n" word. (Tabs A, B, C, D and E). The word "blank" is currently used frequently in the WPD and its origin and meaning as a substitute for the "n" word are well known to the officers of the WPD.[2] (Tabs B, C, D, and E).

Rock's continual use of the words "motherfucker" and "blank" or used in combination occurred numerous times during this 2 ½ year interval. (Tab A). Plaintiff made at least six attempts during this time to request that he cease and desist the use of these words. (Tab A). Plaintiff did not go beyond Lt. Rock because he believed that it would not be effective. (A-126). Plaintiff was very distressed as a result of this continual

---

[2] Defendant does not agree with the meaning of this word and submitted various affidavits wherein the word "blank" was deemed "race neutral" and meant something different to each affiant: to Officer Alequine it is a negative to be filled in by the receiver (A-59); Officer John Burns: "loser" (A-69); Officer Michael Gifford: "nothing", "zero" (A-80); Officer Alfred Izquierdo: "Defendant" (A-85); and per Defendant's Answer to Complaint, paragraph 8, "knucklehead". (A-15).

4

hostile conduct toward him by his supervisor. The continual use of the word "blank" led Plaintiff to believe that it was racially motivated. (Tab A).

In addition to insults from Lt. Rock to Plaintiff, Plaintiff experienced other adverse conduct from him. (Tabs A, I). On one occasion, during roll call where all members of F Platoon were present, Lt. Rock used the "n" word in quotes when referencing an African-American prisoner. *Id.* As he said the "n" word, he looked directly at Turner. *Id.*

On another occasion, during a roll call, Plaintiff greeted Lt. Rock by saying "How are you today, Lt. Rock?" Rock's response was: "Everett, shut the fuck up and sit the fuck down." *Id.*

During another roll call, Lt. Rock observed that Plaintiff had a clipboard with various papers clipped to it. Plaintiff was in the process of doing paperwork. Rock then asked Plaintiff, "Is that my fucking clipboard, you fucking stole my clipboard! Give me my fucking clipboard." While Plaintiff was attempting to hand the clipboard to Rock, Rock snatched the clipboard from Turner's hands, throwing the papers onto the floor in front of everyone. At that point, Rock told Turner in front of the assembled members of F Platoon, "How do you like that motherfucker, fucking thief." *Id.*

At another roll call in December 2003, Rock inquired as to whom from the Platoon would be attending the Platoon holiday party that was being held at Harry's Savoy Grill. Plaintiff and Officer Curry advised Rock that they were not going to attend the party. Both officers were concerned about exposing their wives to Lt. Rock and his conduct. Although neither officer advised Lt. Rock of his reasons for not attending, Rock

5

proceeded to single out Officers Curry and Turner, stating, "You two, Curry and Turner, are fucking up, on and off duty." *Id.* (A-78).

Plaintiff prepared a four-page complaint dated January 26, 2004 to be given to Chief Szczerba. (Tab I). The complaint expressed his "total disgust of past and present events that have taken place on F Platoon that have taken place operating under the supervision of Lt. Mitch Rock of the City of Wilmington Police Department." In this complaint, Turner detailed much of the conduct of Rock toward him during those 2 ½ years but with an emphasis on the last few months. In the complaint, he said that he advised Chief Szczerba that he had never "experienced blatant, degrading disrespect and humility in any other jobs with the WPD." He closed by stating that he did not "expect to have to experience this horrific prejudice and unprofessional treatment within the Wilmington Police Department by Lt. Mitch Rock." *Id.* This complaint was hand-delivered by Turner's wife on January 27 to the City Personnel Office and to Samuel Pratcher, the City Personnel Officer and formerly Wilmington Police Chief. (A-249 through A-252).

As a result of Plaintiff's complaint, an investigation immediately began under the auspices of the Office for Professional Standards. (Tab O). The investigation was conducted by Inspector James Wright (the number two man in WPD) and Sergeant Steven Barnes. *Id.* According to Inspector Wright, his June 29, 2004 Departmental Information as a result of the Internal Investigation/Everett Turner (A-154), "all subordinate officers on F Squad were requested to submit a Departmental Information report and all complied." *Id.* This June 29 document was not supplied by WPD as a result of their Initial Disclosures. (Tab G). Further, it appears that at least four

6

questionnaires from officers working on F Platoon were not provided by way of Defendant's production or in the Appendix supporting their Opening Brief. (Tab O).

Sgt. Barnes, by way of a memo dated June 24, 2004, confirmed that Corporals Lynch and Curry corroborated Officer Turner's statement that Rock had told Turner to "shut the fuck up and sit down." (Tab M). Although Corporals Lynch and Curry were active members of F Platoon and where Curry was Turner's partner, there are no completed questionnaires from either officer.

Additionally, that same memo from Sgt. Barnes acknowledges that Officers Rentz and Crawford attended the 2003 Christmas party. (Tab M). Plaintiff alleged that there was a verbal altercation between Lt. Rock and Officers Crawford and Rentz. (Tab I). The record does not reflect any completed questionnaires from either Rentz or Crawford.

While Defendant stated in its Opening Brief that there was no evidence of an altercation between Lt. Rock and either Rentz or Crawford, the affidavit of former officer Reginald Harvey states that Officer Rentz, while at the Christmas party at Harry's Savoy Grill, had to come between Lt Rock and Officer Crawford to end a verbal altercation between the two at the restaurant. (Tab E).

The investigation completed by Inspector Wright confirmed that Lt. Rock, during a roll call in front of Plaintiff did tell Plaintiff to "shut the fuck up and sit the fuck down." (Tab O).

As to the use of the "n" word at roll call, while Inspector Wright confirmed that it was used by Lt. Rock, he found no transgression. (Tab O). Wright found that Rock was "merely quoting the Defendant." *Id.* He also determined that no other minority officer present was offended. *Id.* Wright did not acknowledge that Officer Alequine by his

affidavit said specifically that, "Several officers in the Platoon felt that the remark was communicated in an inappropriate forum." (A-59).

Wright and Barnes investigated Plaintiff's allegation that Rock berated Plaintiff and his partner, Curry, by stating "you guys are fucking up, on and off duty." (Tab O). They found that Lt. Rock did not recall this incident and, further, that they could not corroborate this through any of the other reports. (Tab O). However, the affidavit of Robert Curry found at A-78 refers specifically to this allegation which is found in paragraph 13 of Plaintiff's Complaint (the lawsuit). Curry's response was that "I remember the above-described comment made by Lt. Rock." (A-78). Curry went on to say that he felt that it was said in a jovial manner and that he was not offended by this comment. (A-78).

While the investigation did confirm the "clipboard incident" wherein Rock grabbed the clipboard from Turner and threw the papers on the floor, this was found not to be actionable because it was considered a joke. (Tab O). Lt. Rock was found to have "busted" on Turner. *Id.*

As a result of the investigation by Wright and Barnes, they could substantiate only one of Plaintiff's allegations and as a result, Lt. Rock received a written reprimand. (Tab O). A copy of the Summary Punishment Offer regarding Lt. Rock dated July 8, 2004 was not produced with Defendant's discovery but was produced as part of the Appendix. (Tab P).

Sometime in the month of February, Officer Reginald Harvey had an opportunity to look at his personnel file and found a memorandum from Lt. Rock to Chief Szczerba bearing a date of January 22, 2004 and captioned "Personnel Transfers". (A-233).

8

Harvey relayed what he had seen to Turner wherein he and Turner were to be transferred from F Platoon to one of the five patrol platoons. *Id.* This proposed transfer was signed off by Captain Marlyn Dietz, Supervisor of Lt. Rock on February 6, 2004 and was signed off by Inspector James Wright on February 13, 2004. (Tab J). This prospective transfer was later confirmed by Captain Maggitti of Human Resources Division, WPD, who advised that upon Turner's return to active duty, he would work under Lt. Battaglia in a patrol platoon. (A-287). Turner never received medical clearance to return to active duty and was subsequently "pensioned off" in July 2005. (Tab T).

In response to Plaintiff's complaint that was filed with the WPD on January 27, 2004, the Department immediately initiated an investigation. (Tab O). The investigation included a submission of a "Departmental Information Report" from all of the subordinate officers in F Platoon as well Sgts. Ciotti, Jones and Staats. This information appeared from the record to have been submitted to Inspector Wright during the first week of February, 2004. *Id.*

The subordinate officers were requested to answer seven specific questions having to do with Turner's allegations. (A-100). Inspector Wright reported that all of the subordinate officers in F Platoon as well as Sgts. Ciotti, Jones and Staats, submitted these reports. (Tab O). Defendant, as part of the document production pursuant to the Initial Disclosures and the documents contained in their Appendix supporting their Opening Brief, failed to submit six of the "Departmental Information Reports" that Inspector Wright stated had been received. They are from Sgts. Jones and Staats, and subordinate officers, Lynch, Curry, Crawford and Rentz.

This investigation was completed and reported by Inspector Wright in a Departmental Information to Chief Szczerba dated June 29, 2004. The investigation reached the following conclusions pertinent to Plaintiff's claim of discrimination:

1.  The investigation verified that Lt. Rock used the word "motherfucker" and "blank" while addressing officers.

2.  Plaintiff's complaint of the loose use of the "n" word by Lt. Rock was deemed unfounded. Inspector Wright found that this was a past incident and that Rock was merely "quoting the Defendant." In addition, they found that there were no other minority officers present who were offended.

3.  The investigation substantiated the claim that Lt. Rock told Plaintiff to "shut the fuck up and sit the fuck down." This was verified by Officers Lynch and Curry (whose Departmental Information Reports were not produced by Defendant).

4.  The "clipboard incident" was verified but was determined to be an instance where Lt. Rock "busted" on Turner.

5.  The investigation could not substantiate Turner's allegation that Lt. Rock told him and Curry "you guys are fucking up on and off duty."

6.  The investigation could not substantiate the alleged altercation at the Christmas party following Inspector Wright's interview of Officers Rentz and Crawford. There are no notes from any interview with Rentz or Crawford nor are there Departmental Information Reports from either Officer Rentz or Officer Crawford.

7. The alleged remark made by Sgt. Jones wherein he told Turner that he was seeking "younger, more aggressive officers" was not substantiated because Sgt. Jones said he never told Officer Turner this.

8. Inspector Wright could not verify that Officer Turner told Lt. Rock that Rock's comments were not welcome and to stop addressing Turner in this manner and, as a result of the entire investigation, Inspector Wright could find "no evidence of discrimination." (Tab O).

On April 12, 2004, Plaintiff filed a Charge of Discrimination jointly with the Delaware Department of Labor and the Equal Employment Opportunity Commission. (A-32). In that Charge of Discrimination, Plaintiff charged Defendant with racial discrimination, age discrimination[3] and retaliation. *Id.*

WPD, through its counsel and the Office of the Wilmington City Solicitor, responded to Turner's Charge of Discrimination by letter dated August 19, 2004. (A-37 through A-42). In their letter, the City categorically denied that it had discriminated against Cpl. Turner in any fashion and that it had not retaliated against Turner for filing an internal complaint against Rock. The City's letter addressed to the Delaware Department of Labor relied upon three affidavits that were attached to the August 19, 2004 letter, *id.*, the affidavits were written by Lt. Rock, Master Sgt. Staats, and Inspector Wright.

In his affidavit, Lt. Rock stated the following which are pertinent to Plaintiff's Charge of Discrimination:

---

[3] As noted in the The Nature and Stage of the Proceedings, Plaintiff will not further pursue a claim of age discrimination in this litigation. A-32. Plaintiff is not conceding that no age discrimination occurred but rather wishes to voluntarily withdraw and dismiss this claim.

(1)     He stated that he received notice from his superiors that Cpl. Turner had lodged a written complaint against him on or about February 17, 2004. ¶ 5.

(2)     Rock testified that he was "shocked" to receive Turner's complaint having believed that he had a "very good working relationship" with Turner. ¶ 6.

(3)     Rock acknowledged that he used "curse words and the term 'blank'" but it was "never directed specifically at Cpl. Turner or any other officer."

(4)     Lt. Rock swore that "Cpl. Turner has never expressed to me that he found the cursing or the use of "blank" to be offensive, humiliating or disrespectful at any time. ¶ 8.

(5)     Lt. Rock testified that "when an officer, including Cpl. Turner, greets me with 'Good morning' or 'How are you today', I have never responded by cursing them or by telling them to 'shut the f--- up'. ¶ 12. (Tab R).

In April 2004, Plaintiff contacted Captain Maggitti, Human Resources Director at WPD, requesting the opportunity to come back to work. (A-1 through A-13). Maggitti's response was that Plaintiff would need to have a "fitness for duty evaluation by psychiatrist David Raskin" before reporting back to work. *Id.* Captain Maggitti also informed Plaintiff that upon his return to work, he would be assigned to the patrol division under Lt. Battaglia.

After being evaluated by Dr. Raskin, Plaintiff was found to be unfit for duty. (Tab K). Raskin found, in particular, that Plaintiff is a "very angry man who is very resentful about what he considers to be humiliating and degrading treatment by the police." Dr. Raskin found that "[Turner] was potentially threatening in his speech to me about situations in which he would be spoken to inappropriately and his sense that he might respond in an aggressive manner to such a situation." *Id.*

On May 14, 2004, Plaintiff depleted his sick, vacation and comp time. On May 15, 2004 Plaintiff went on half-pay status through May 28, 2004. From May 29, 2004 to July 9, 2004 Plaintiff was on a no-pay status. (A-8).

On May 27, 2004, Plaintiff spoke with Gary Hutt, Director of Risk Management and Employee Benefits with the Wilmington Personnel and Benefits Department. Hutt stated that he was unaware of Plaintiff's situation but gave Plaintiff some advice and told him that he would look into the matter and return his call. Mr. Hutt never followed up with Plaintiff. (A-8).

Also on May 27, 2004, Plaintiff filed a petition for worker's compensation benefits. (Tab L). In the petition, which is found in Plaintiff's Appendix, Plaintiff described the incident as "work related stress inflicted by my superior officer." Plaintiff went on to state that "[d]ue to the continuous derogatory treatment and name calling and comments, it was necessary for me to be treated for stress, depression and high blood pressure." *Id.*

Defendant did not oppose Plaintiff's worker's compensation petition. As such, Plaintiff and the City entered into an "Agreement as to Compensation" dated June 28, 2004. Plaintiff continues to this day to receive total disability benefits under the City of Wilmington worker's compensation program. (Tab V).

Plaintiff was informed by Inspector Wright that Lt. Rock was charged with rude and insulting language. (Tab O). In a letter issued by Captain Nancy Dietz to Plaintiff on July 16, 2004, Captain Dietz from the WPD Office of Professional Standards advised Plaintiff that their investigation had not discovered any violations of equal opportunity or discrimination laws. (Tab Q). Plaintiff was advised, however, that Lt. Rock's conduct

13

was not within the "high standards of performance", and the Office substantiated a violation as a result of Turner's allegation and "the officer [Lt. Rock] will be disciplined appropriately." *Id.*

On June 6, 2005, Chief Szczerba wrote a letter to Cpl. Turner advising Turner that he was being placed on the Wilmington Department of Police Retirement List effective July 1, 2005. (Tab T).

## ARGUMENT

## I.    THE EXISTENCE OF GENERAL ISSUES OF MATERIAL FACT MUST PRECLUDE SUMMARY JUDGMENT.

It is apparent from the Statement of Facts that Defendant has produced more facts in dispute than it has provided corroboration for other less significant facts. WPD's Internal Investigation citing only certain statements from officers that were produced as well as citing statements that were not produced by Defendant in this litigation makes it clear that there is a great deal of controversy about the facts that laid the basis of Plaintiff's claim.

Plaintiff's racial discrimination claim arises from the following allegations:

1.    Lt. Rock's continual use of derogatory names toward Turner in both private and roll call settings; the words most often used were "motherfucker" and "blank";

2.    The word "blank" is a substitute for the "n" word;

3.    Turner made many requests to Rock that he desist the derogatory names;

4.    Upon greeting Lt. Rock with "good morning," Rock responded with: "Everett, sit the fuck down and shut the fuck up;"

5.    The clipboard incident wherein Rock grabbed the clipboard from Turner's hands, threw it to the ground spilling all the papers, and then accused Turner of being a thief;

6.    Lt. Rock's statement at roll call that Turner and his partner Curry were "fucking up on and off the job."

7.    Lt. Rock's use of the "n" word while relating a story at roll call.

As we will set forth in Argument II, *infra*, if all or most of these elements are met, Plaintiff will have set forth a *prima facie* case for racial discrimination. Based upon the record at hand, however incomplete (because of Defendant's apparent failure to submit key documents), there are genuine issues of material fact raised as to each of these elements of Plaintiff's racial discrimination claim.

(1)    As to the continual use of the derogatory terms, there is an open conflict between Turner and Rock. Turner has stated by way of his Complaint and his affidavit that this was a continual occurrence from shortly after the time that Officer Turner began working in F Platoon under Lt. Rock in 2001. (Tab A). Although there may have been a couple of initial months without these derogatory terms, the terms were a substitute for Turner's name which was not used by Rock since the mid-part of 2001. *Id.* Rather, Lt. Rock substituted Turner's name with the words "motherfucker", "blank" or "dumbass". (*Id.*; Tab C). Rock testified in his Department of Labor affidavit that he never used curse terms or the word "blank" directed specifically at any officer, including Corporal Turner. (Tab R). WPD's Internal Investigation found to the contrary that, "[s]everal officers on F squad verified that Lt. Rock used the word 'motherfucker' and 'blank' while addressing officers." (Tab O). Paragraph 8 of Defendant's Answer admits that Rock may have called Plaintiff a "blank". *Id.* However, in Lt. Rock's statement to the Office of Professional Standards, he stated that he never used the word "blank directed to Turner or any other officer." This statement found in the Appendix at A-108 is not verified.

(2)    Plaintiff has produced five affidavits including one from the officer who originated the term "blank". (Tabs A, B, C, D and E). Officer Eric Green testified that he began to use the word within WPD to substitute for the "n" word. (Tab B). Defendant

has produced affidavits from other Wilmington Police Officers who were asked to define the word "blank".  (A-50 through A-95).  All agreed that it is a derogatory term.  *Id.* However, there was a difference as to the meaning.  The affidavits from Defendant stated that "blank" meant as follows: (i) "knucklehead" (Lt. Rock) (A-15); (ii) "loser" (Officer John Burns) (A-69); (iii) "zero" (Officer Michael Gifford) (A-80); (iv) "Defendant" (Officer Alfred Izquierdo) (A-85); and (v) "negative term filled in by the receiver in the communication (Officer Porifirio Alequine) (A-60).  Defendant has repeatedly referred to the word "blank" as a "racially neutral" term.  *Id.*  This is directly refuted by Plaintiff's affidavits which show the origin and use of the word "blank" as a substitute for the "n" word, a racial epithet.  (Tabs A, B, C, D and E).

     (3)    Turner made numerous requests for Rock to desist from the demeaning conduct.  (Tab A).  This was determined to be one man's word against another.  (Tab O). Turner states categorically in his affidavit that he made these many requests and was able to cite with particularity the last three requests to desist in November and December of 2003, while Rock testified by affidavit that Turner "never expressed to me that he found the cursing or the use of "blank" offensive, humiliating or disrespectful at any time." (Tab A, Tab R).  Rock also previously testified by affidavit that he was "shocked" to receive Turner's complaint, believing that he and Turner had a "very good working relationship."  (Tab R).  Rock testified by affidavit that he received notice that Turner filed his January 26 complaint on February 17, 2004.  (Tab R).  However, the record reflects that the Internal Investigation of Turner's January 27 complaint was begun and substantially completed in the first week of February 2004.  (Tab O).

(4)    Turner greeted Rock who then told Turner to "sit the fuck down and shut the fuck up." (Tab A). Rock testified by affidavit that "[w]hen an officer, including Cpl. Turner, greets me with "good morning" or "how are you today," I have never responded by cursing them or by telling them to "shut the f--- up." (Tab R). Despite Rock's denial, the Internal Investigation found that this statement was substantiated by Officers Lynch and Curry. (Tab O). The statements from Officers Lynch and Curry were not provided by Defendant as part of the document production in this matter.

(5)    Turner's clipboard was grabbed from him by Rock and thrown to the floor scattering his papers. (Tab A). Plaintiff testified that he felt physically threatened as a result of this incident. *Id.* The Internal Investigation appears to have corroborated this incident but was dismissed by Inspector Wright as being a joke. (Tab O). Wright found that Rock had "busted" on Turner. *Id.* Wright acknowledged that several officers were present at roll call and recall this incident. (Tab O). However, there was no acknowledgement of this in the documents produced by Defendant.

(6)    Lt. Rock accused Turner and his partner of "fucking up, on and off the job." (Tab A). The Internal Investigation found that this claim could not be substantiated. (Tab O). Inspector Wright found that "Lt. Rock does not recollect this incident and I cannot corroborate this through the submitted reports." (Tab O). However, Officer Robert Curry, Turner's partner at the time of this incident, filed an affidavit acknowledging that he did recall the incident as set forth by Turner in his Complaint. (A-78).

(7)    Lt. Rock used of the "n" word during roll call. (Tab A). This incident was universally acknowledged by officers who submitted their Investigation

18

Questionnaires. (Tab O). These officers, as well as Inspector Wright, determined that there was no problem with Lt. Rock's use of this word. *Id.* Wright determined that this claim was "unfounded." *Id.* Wright's rationale was that "Lt. Rock used the word 'n [abbreviation]' in a past incident with a defendant and he was merely quoting the defendant." *Id.*

The evidentiary conflicts with regard to each of the elements set forth by Plaintiff in his initial January 26, 2004 letter as well as the Complaint filed in this Court, must preclude Defendant from obtaining summary judgment. In addition, the record demonstrates that Defendant has failed to produce (for reasons unknown) at least six Departmental Information Reports from F Platoon officers. Further, Plaintiff is responding to Defendant's Motion without the benefit of having Plaintiff's personnel file which has still not been received from Defendant. (Tab H).

Defendant's argument that Plaintiff cannot establish *respondeat superior* is misplaced. The evidence produced by Plaintiff by way of affidavits and Plaintiff's deposition shows that the use of the term "blank" substituting for the "n" word was often used in the Wilmington Police Department. Further, as the evidence suggests, the most severe harassment lodged against Plaintiff by Lt. Rock occurred in front of F Platoon during roll call. WPD was put on notice by these actions and had ample opportunity to stop the harassment by Lt. Rock. Instead, after Plaintiff filed his internal complaint the Internal Investigation culminated with a slap on the hand of Lt. Rock for using rude and insulting language.

The United States Supreme Court has held that if a supervisor creates a hostile work environment, liability turns on whether the supervisor's acts are "official" or

"unofficial". *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004). In this matter, there is no suggestion that Rock's conduct was done outside the workplace or outside the scope of his employment. Here, the City argues disingenuously that Rock's conduct does not "arise from a misuse of Lt. Rock's managerial authority." Obviously, the City has misconstrued the facts to suggest that Rock's conduct was not a misuse of his managerial authority.

Plaintiff respectfully submits that the outright inconsistencies and contradictions as well as Defendant's failure to produce all documents that it acknowledged in its investigation must preclude summary judgment.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome under the governing substantive law. *See, Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). A dispute over a material fact must be "genuine", *i.e*., the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." *Id.* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).

To survive a motion for summary judgment, Defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

In the present matter, the current record, together with the affidavits establishes that there are several genuine issues of material fact. Therefore, Defendant is not entitled to summary judgment as a matter of law.

## II.   PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CLAIM OF RACIAL DISCRIMINATION BY WAY OF HOSTILE WORK ENVIRONMENT.

Defendant's approach to its argument suggesting that Plaintiff has not brought forth a valid claim of hostile work environment is premised on an examination of each of the various points of discrimination raised by Everett Turner in his initial complaint to his superiors as well as his subsequent complaints to the Delaware Department of Labor and the Complaint filed in this Court. What Defendant fails to recognize is that such a determination of a hostile work environment must depend upon the "totality of the circumstances." *Seldomridge v. Uni-Marts*, 2001 U.S. Dist. LEXIS 9491 (D. Del. 2001). Plaintiff respectfully argues that the long course of demeaning and racially hostile behavior exhibited by Lt. Rock toward Plaintiff easily satisfies the criteria for a hostile work environment underlying racial discrimination.

Lt. Rock acknowledged that he began working with Corporal Turner in April 2001. (Tab C). They continued to work together on F Platoon with Rock being the Operations Supervisor until Plaintiff's departure from the Wilmington Police Department. (Tab A). Turner's last day of active service was January 26, 2004. *Id.*

21

During that time, less the first couple of months when they worked together and also less two or three months when Lt. Rock attended the FBI Academy, Plaintiff was continually harassed by Lt. Rock. (Tab A). Rather than use Plaintiff's first name, or even his last name, Rock continued to refer to him as "motherfucker", "blank" or "dumbass". (Tab A, Tab C). Plaintiff took particular offense to the word "blank" because he knew what that word meant. (Tab A). This was a word introduced to the Wilmington Police Department by Officer Eric Green in the late 90's and was used to substitute for the "n" word. (Tab B). The use of the word "blank" was well known throughout the Wilmington Police Department. *Id.*

Rock not only used offensive names toward Turner but he was verbally and physically abusive in other means. Plaintiff approached Rock on several occasions in private asking Rock to cease and desist the derogatory name calling. (Tab A). Rock's usual response was "yeah, motherfucker, right" and then he would walk away. (Tab A). Plaintiff had frequent contact with Rock usually seeing him eight to ten times each week. (Tab A).

In the fall of 2003, the strained relationship between Rock and Turner deteriorated further. At one point during a roll call, Rock used the "n" word in recounting a story as to what a prisoner had said. (Tab A). When Rock recounted the story, he looked up specifically at Everett Turner.

Turner continued to serve as a subordinate to Rock and treat him with respect. On one occasion when Rock walked into the room, Turner greeted him with "Good morning Lt. Rock, how are you doing?" Rock's response was "Everett, sit the fuck down and shut the fuck up." (Tab A). Rock also during a roll call singled out Turner and his partner,

Curry, and told the assembled crowd that they were "fucking up both on and off duty."
*Id.* In a display of physical force, Rock grabbed a clipboard from Turner's hands,
throwing it down on the floor and scattering all of Turner's papers. *Id.* Rock followed
that by asking Turner in front of everyone "How do you like that, motherfucker, fucking
thief." *Id.*

In order to be actionable, a hostile work environment must be "sufficiently severe
or pervasive ." Given that this conduct of Rock toward Turner continued for a period of
approximately 2 ½ years, this must be considered pervasive. This issue has been
addressed by the Third Circuit in *Zelinski v. Pennsylvania State Police*, 2004 U.S. App.
LEXIS 21235 (3d Cir. 2004). In *Zelinski*, the Court held that the alleged incidents that
contributed to the hostile work environment occurred over a period of slightly more than
a year and they were deemed to be pervasive or certainly that there was a material issue
of fact as to whether the Plaintiff was exposed to a severe or pervasive hostile work
environment.

Defendant has attempted to isolate Rock's bad conduct and to minimize it by
ignoring the inconsistencies that were shown in our Argument I, *supra*. For example,
Defendant argues that there is a "singular quotation of the racial epithet." This flies in
the face of the evidence produced by Plaintiff in this matter, namely wherein the
continual use of the word "blank" by Rock amounted to a racial epithet every time it was
used.

Moreover, Defendant did not acknowledge anywhere in its briefing that it
accepted without any apparent objection, Plaintiff's claims set forth in his worker's
compensation petition. Defendant's response to Plaintiff's claim was to accept the claim

as submitted by Plaintiff Everett Turner. Plaintiff respectfully suggests to the Court that Defendant has acknowledged the harassment that produced Plaintiff's injuries.

The conclusion of the Internal Investigation instigated by Plaintiff's complaints found that there was no discrimination towards Plaintiff or his fellow officers. (Tab O). Such a finding cannot be given any credence given the substantial conflict in the facts presented.

Plaintiff has set forth a *prima facie* claim of racial discrimination. The elements are as follows:

1.  He is a member of a protected class;

2.  He was treated differently than persons similarly situated but of a different background;

3.  The discrimination resulted in a tangible employment action; and

4.  The City did not have a legitimate, non-discriminatory reason for its actions.

*McDonnell-Douglas v. Green*, 411 U.S. 792 (1973).

The evidence produced by Plaintiff and by Defendant, for that matter, shows that Plaintiff has satisfied each element. As an African-American, Plaintiff is a member of a protected class and the extended demeaning treatment by Lt. Rock wherein a racial epithet or its known substitute was continually used by Rock against Plaintiff. This discrimination resulted in a tangible employment action necessitating Plaintiff's request for stress leave and the approval from WPD. Indeed, Plaintiff's worker's compensation petition articulated the reason for his leaving work and this was agreed to by WPD when they signed the Agreement for worker's compensation allowing Turner to get total

24

disability benefits. Lastly, the conduct of Rock in this manner was so egregious that there can be no consideration that Defendant had a legitimate, non-discriminatory reason for the allowance of Rock to treat Plaintiff in such a hostile manner.

## III.    PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CASE FOR RETALIATION.

The claim for retaliation is much more simple and direct than acknowledged by Defendant in its Opening Brief. Plaintiff filed the claim charging discrimination by way of hostile work environment on January 26, 2004. In early February 2004, Plaintiff's superiors, who were in receipt of Turner's complaint, approved a transfer of Plaintiff from F Platoon back to a patrol position. Plaintiff thrived in the environment of community policing which was only available in F Platoon and he would not have an opportunity to do same in the patrol division. Plaintiff testified by affidavit that he loved community policing and wanted to continue to work in that capacity. (Tab A).

The elements that Plaintiff must establish for a *prima facie* case of retaliation are as follows:

1.    He engaged in protected employee activities;

2.    The City took an adverse employment action against him, after or contemporaneously with his protected activity;

3.    A causal link existed between the protected activity and the City's adverse employment action.

*Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173 (3d Cir. 1999).

There is no question that Turner's complaint addressed to Chief Szczerba dated January 26, 2004 was protected employee activity. (Tab I). Defendant has rather

focused on the second element, that of adverse employment action. Upon Plaintiff's return to active duty (which unfortunately never occurred) he would have been transferred from F Platoon. (Tab J). The orders to transfer Plaintiff were set forth on a memorandum signed by Lt. Rock's supervisors, Captain Marlyn Dietz and Inspector James Wright. *Id.*

The question is whether a transfer from F Platoon to patrol is considered an adverse employment action. This issue has been addressed and the Court determined that such a transfer would constitute adverse employment action. The Third Circuit has determined that "adverse employment action" under Title VII is satisfied where a plaintiff police officer claimed that a patrol assignment was less desirable than the detective bureau even though plaintiff did not lose his pay or rank as a result of his transfer. *Hampton v. Bureau of Tinton Falls Police Department,* 98 F.3d 107, 115-116 (3d Cir. 1996).

Lastly, there is a "causal link" between Plaintiff's letter and the adverse employment action. The evidence shows that the letter from Plaintiff dated January 26 was not received by Defendant until January 27. (A-249). Within the next two weeks, both Captain Dietz and Inspector Wright signed off on this transfer. (Tab J). Inspector Wright headed the Internal Investigation done as a result of Plaintiff's complaint. *Id.* Captain Dietz noted that in this interval he had spoken with Lt. Rock "regarding these moves." *Id.* Dietz was advised that Turner was being transferred "due to performance" and to "keep F Platoon providing the highest level of performance." *Id.*

The notion of performance appears to be a pretext. The only suggestion of performance issues came from affidavits from Officers Gifford and Curry. (A-78

through A-81). The affidavit of Reginald Harvey testified that Officer Gifford is unreliable and has submitted falsified police reports. (Tab E). The statements of Officers Curry and Gifford in their affidavit were refuted by Plaintiff in Plaintiff's affidavit. (Tab A).

It is respectfully submitted that Plaintiff has set forth a prima facie case of retaliation in response to his claim of a racially hostile working environment.

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully request that this

Honorable Court deny Defendant's Motion for Summary Judgment.

Dated:  September 18, 2006                    **MARGOLIS EDELSTEIN**

Jeffrey K. Martin Esquire (DE-2407)
1509 Gilpin Avenue
Wilmington, DE  19806
(302) 777-4680
Attorneys for Plaintiff

28

**SHIRLEY SELDOMRIDGE, Plaintiff, v. UNI-MARTS, INC., Defendant.**

**Civil Action No. 99-496 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2001 U.S. Dist. LEXIS 9491*

**July 10, 2001, Decided**

**DISPOSITION:** [*1] Uni-Marts' Motion for Summary Judgment GRANTED. Summary Judgment ENTERED in favor of Uni-Marts and against Seldomridge on all claims in complaint.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant employer, alleging that she experienced a hostile work environment was subsequently constructively discharged as a result of indecent exposure by her supervisor. The employer moved for summary judgment.

**OVERVIEW:** The employee's supervisor appeared completely naked before the employee during work hours, which caused her psychological harm. The employer granted a leave of absence to the employee and subsequently terminated the supervisor. Upon the employee's return to work, the employee alleged that she was subjected to comments concerning the incident from a co-worker and customers, to the extent that a hostile work environment was created which forced the employee to resign. The court first held that, although offensive and inappropriate, the brief exposure incident was not so severe that it altered the terms and conditions of her employment, and thus did not create a hostile work environment. Further, the teasing and comments from the co-worker and customers did not constitute actionable sexual harassment since it was not based on the employee's gender and, in any event, the employee failed to show that the employer knew or should have known of such conduct. For the same reasons, the employee's resignation did not constitute a constructive discharge, absent evidence that the employer intentionally made her working conditions intolerable.

**OUTCOME:** The employer's motion for summary judgment was granted.

**CORE TERMS:** hostile work environment, supervisor, harassment, customer, severe, sexual harassment, hostile, pervasive, co-worker, sex, reasonable person, constructive discharge, constructive notice, harassing conduct, summary judgment, actionable, offensive, matter of law, isolated, gender, work environment, detrimentally, workplace, single incident, abusive, teasing, subjected, tangible, constructively discharged, intolerable

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Materiality*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN1] The court will grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. An issue is genuine if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a fact is material if it could affect the outcome of the suit under governing law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
[HN2] For the non-moving party to prevail on a motion for summary judgment, the party must make a showing sufficient to establish the existence of every element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*

[HN3] In deciding a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. Moreover, it is not the province of the court to weigh the evidence and to decide the case on its merits; rather, the court shall simply determine whether there is a genuine issue for trial.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Severe & Pervasive Standards*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Coverage & Definitions > Sexual Harassment*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employment Practices > Compensation*
[HN4] Under Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e* et seq., it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin. *42 U.S.C.S. § 2000e-2*(a)(1). Although the statute mentions specific employment decisions with immediate consequences, it covers more than "terms" and "conditions" in the narrow contractual sense. Thus, sexual harassment that is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working condition violates Title VII.

*Environmental Law > Environmental Justice*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Severe & Pervasive Standards*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN5] Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment. In order to fall within the purview of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., the conduct in question must be severe or pervasive enough to create both an objectively hostile or abusive work environment, i.e., an environment that a reasonable person would find hostile, and an environment the victim-employee subjectively perceives as abusive or hostile.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN6] In deciding a hostile work environment claim, the court must examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN7] In order to establish a hostile work environment claim, a plaintiff must show that: (1) the plaintiff suffered intentional discrimination because of the plaintiff's sex, (2) the discrimination was pervasive or regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability.

*Civil Procedure > Discovery > Methods > General Overview*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN8] In general, an isolated incident of sexual misconduct is not actionable under Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e* et seq. In exceptional cases, however, an isolated incident may be actionable under Title VII if it is extremely serious such that it alters the terms and conditions of employment to create a hostile or abusive work environment. In other words, a single incident may support a claim for hostile work environment sexual harassment if the incident is of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN9] In determining whether a plaintiff-employee has been subjected to a hostile work environment, the court not only looks to the regularity or severity of allegedly harassing conduct, but also must determine whether the conduct would detrimentally affect a reasonable person. After all, not all workplace conduct that may be de-

Case 1:05-cv-00716-GMS    Document 26    Filed 09/18/2006    Page 35 of 55

Page 3
2001 U.S. Dist. LEXIS 9491, *

scribed as harassment affects a term, condition, or privilege of employment.

**Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > General Overview**

[HN10] While sexual overtones are not necessary to show discrimination because of the plaintiff's sex, the offending conduct must nonetheless be motivated by a plaintiff's sex or gender. Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., is not a general civility code. Ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing, are not actionable.

**Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964**

[HN11] Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e* et seq., is not a shield against harsh treatment in the workplace; it protects only in instances of harshness disparately distributed. In particular, allegedly harassing conduct that is motivated by a bad working relationship, by a belief that the plaintiff has in some way acted improperly, or even by personal animosity is not actionable under Title VII.

**Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Coverage & Definitions > General Overview**
**Torts > Vicarious Liability > Employers > General Overview**

[HN12] Employer liability exists where the defendant employer knew or should have known of the co-worker harassment and failed to take prompt remedial action.

**Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements**
**Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Coverage & Definitions > Sexual Harassment**

[HN13] An employer has constructive notice of co-worker harassment in two situations: (1) where an employee provides a supervisor with enough information to raise the probability of sexual harassment in the minds of a reasonable employer, or (2) where harassment is so pervasive and open that a reasonable employer would have had to be aware of it.

**Labor & Employment Law > Wrongful Termination > Constructive Discharge > Burdens of Proof**

**Labor & Employment Law > Wrongful Termination > Constructive Discharge > Statutory Application > Title VII of the Civil Rights Act of 1964**
**Labor & Employment Law > Wrongful Termination > Defenses > Voluntary Resignations**

[HN14] A plaintiff who voluntarily resigns may maintain a case of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge. In determining if a constructive discharge has occurred the court should apply an objective test. That is, whether the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign. Thus, a plaintiff must demonstrate that from an objective viewpoint, the employer condoned acts of discrimination which would violate Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq. However, the mere fact that the plaintiff feels uncomfortable or considers her working environment unduly stressful is an insufficient basis for a constructive discharge claim.

**Civil Procedure > Remedies > Damages > Punitive Damages**
**Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Remedies > Punitive Damages**
**Torts > Damages > Punitive Damages > General Overview**

[HN15] *42 U.S.C.S. § 1981a* does not, either expressly or impliedly, create an additional, separate, and independent cause of action for employment discrimination plaintiffs, but merely adds to the damages available to such plaintiffs under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq.

**COUNSEL:** For SHIRLEY SELDOMRIDGE, plaintiff: Thomas S. Neuberger, Thomas S. Neuberger, P.A., Wilmington, DE.

For SHIRLEY SELDOMRIDGE, plaintiff: David Staats, Law Offices of David Staats, P.A., Wilmington, DE.

For UNI-MARTS INC., defendant: Michael F. Bonkowski, Saul Ewing LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

2001 U.S. Dist. LEXIS 9491, *

## I. INTRODUCTION

On August 3, 1999, Shirley Seldomridge ("Seldomridge") filed this employment discrimination lawsuit against her former employer, Uni-Marts, Inc. ("Uni-Marts"), under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* (1994), and the Civil Rights Act of 1991. *42 U.S.C. § 1981*(a) (1994). In her complaint, Seldomridge alleges that she was sexually harassed when her supervisor stood naked before her as she was working one afternoon. As a result, Seldomridge claims that she experienced a hostile working environment and was subsequently constructively **[*2]** discharged from her position at Uni-Marts. Presently before the court is Uni-Marts' motion for summary judgment. After reviewing the record in the light most favorable to Seldomridge, the court concludes that she cannot establish her claims as a matter of law, and will therefore, grant Uni-Mart's motion for summary judgment.

The following sections explain the reasons for the court's decision more thoroughly.

## II. FACTS

Shirley Seldomridge is a married woman who once worked at a Uni-Marts convenience store in Delaware. Seldomridge had been employed at Uni-Marts from December 5, 1997 until on or about February 11, 1998. On Friday, January 16, 1998, Seldomridge was working at the store with her supervisor, Robert A. Walsh ("Walsh"). At some time between 1 and 2 p.m. that day, Walsh told Seldomridge that he was going to go to the bathroom, but when he came out, he would be wearing "nothing but a cigarette." At first, Seldomridge thought her manager was joking, and thus, she paid his comment no mind. However, a few minutes later, she looked up and saw Walsh standing in the doorway to the storage area completely naked and "posing" approximately 36 steps away from where she was **[*3]** standing. According to Seldomridge, she glanced at Walsh for less than a second, promptly looked away, and stated, "Oh, my God." Walsh then ran into the bathroom of the workplace and stayed there for as long as Seldomridge remained in the store.

About ten to fifteen minutes after the incident, Seldomridge called her husband to come and pick her up from the store. Within five minutes, he arrived and took her home. She yelled to Walsh that she was leaving and that she would not be back. Later that afternoon at around three o'clock, Seldomridge says that Walsh called her at home, but she would not talk to him.

On the day of the incident, Seldomridge referred to her employee handbook and telephoned a toll-free number at the Uni-Marts headquarters to complain about the incident. She spoke to someone, described what had happened to her, and was told she would be contacted. She also called this number after Walsh called her at home. There is evidence in the record that Seldomridge received a call from Uni-Marts offices at 4:25 that afternoon.

Seldomridge also approached a New Castle County Police Officer and advised him that Walsh had "exposed his genitals" to her. As a result, Walsh was **[*4]** charged with Indecent Exposure in The Second Degree in violation of Section 764(a) of Title 11 of the Delaware Code. Walsh pled guilty to the charge in March of 1998. Seldomridge further alleges that she was so upset by the incident that she consulted with a psychiatrist on the very next business day. Seldomridge states that she consulted the psychiatrist about the incident one time. The record indicates that Seldomridge had been consulting this psychiatrist since 1995 or 1996.

A. Uni-Marts' Conduct After Incident and Sexual Harassment Policy

As a result of Seldomridge's call to the toll-free number, a Uni-Marts attorney and a Uni-Marts regional manager contacted John C. Minchak ("Minchak"), a group supervisor at Uni-Marts responsible for monitoring the day-to-day operations of a group of Uni-Marts' stores. Minchak was advised to give Seldomridge time off with pay, and told to suspend Walsh until Uni-Marts completed its investigation.

Minchak attempted to contact Walsh on the evening of the incident, but did not have a chance to speak to him until some time between six and seven the next morning. At this time, Walsh admitted his actions. As a result, Minchak immediately terminated **[*5]** Walsh's employment with Uni-Marts.

Uni-Marts contacted Seldomridge to inform her that Walsh had been fired and that she could take time off with pay. Although it is not clear from the record, it appears that Seldomridge returned to work approximately one to two weeks after the incident. In her deposition, Seldomridge acknowledged that Uni-Marts acted appropriately in terminating Walsh. There is no evidence in the record that Walsh contacted her after his termination.

It is undisputed that Uni-Marts had a sexual harassment and discrimination policy that was communicated to Seldomridge when she began her employment. This policy was communicated to employees through the employee handbook and a policy and procedures letter provided to each employee when hired. Seldomridge acknowledges that she received, read, and understood the company's policies by signing the acknowledgment page of the employee handbook and signing and initialing the company's policy and procedures letter. Seldomridge also acknowledges that she "called the sexual harassment

number in that handbook." Thus, it is not disputed that she used the sexual harassment policy when she called the Grievance Committee to report [*6] Walsh's conduct on January 16, 1998.

The policy in effect during Seldomridge's employment was originally drafted in May of 1987. It was amended in October of 1991. The policy seeks to prevent sexual harassment and discrimination in the workplace. It clearly states that sexual harassment or discrimination will not be tolerated by Uni-Marts. The policy also sets forth a process for employees to complain and seek redress from the company in the event that an employee believes he or she is the victim of sexual harassment or is having any type of difficulty in the workplace. Specifically, the policy provides for a Grievance Committee to investigate and remedy any workplace problems.

B. Alleged Hostile Work Environment and Constructive Discharge

Before the incident, Seldomridge stated that Walsh made her uncomfortable at work by saying that he thought she was pretty, he would like to "rock her world," and by making other "stupid, off-the wall comments." The record indicates that Seldomridge never filed a grievance against Walsh for making any of these comments prior to the incident. As Seldomridge's supervisor, Walsh had the power to: set her work schedule, fire her, recommend an increase [*7] or decrease in her wages, undertake or recommend tangible employment decisions affecting her, and direct her daily activities. There is no evidence in the record that Walsh made any negative employment decisions against Seldomridge.

After the incident, Seldomridge continued to work for Uni-Marts for approximately one month after Walsh's termination. During this time period, she alleges that she was subjected to comments by customers and a co-worker named Teddy n1 about the incident with Walsh. She stated that some customers would come into the store and make "really stupid comments." According to Seldomridge, Teddy would agree with customers by saying he did not believe that Walsh would do "anything like that." Besides Teddy, Seldomridge stated that other Uni-Marts' employees believed her. Seldomridge also stated that a customer who was friendly with Walsh did not believe her and that this customer did not want Seldomridge to wait on her. According to Seldomridge, this customer also made "smart comments behind her back." She also stated that one customer joked that he would take his clothes off, too. Seldomridge characterized the conduct by Teddy and certain customers as an "every [*8] day thing."

n1 Although Seldomridge states that Teddy was "hostile" to her and would not speak to her, she does not provide any specific examples.

Seldomridge admits that she never used the phone number in the handbook to notify the Grievance Committee of the problems she was having in the store. She also admits that she never notified anyone in management at Uni-Marts about any problems in the store after the incident with Walsh. However, Seldomridge claims that the acting store manager at this time knew how she was being treated. There is no other evidence in the record supporting this claim. Within a month after returning to work, Walsh left her employment at Uni-Marts for another job at a place called the Eating Post.

C. Walsh's Employment At Uni-Marts

Walsh was hired by Uni-Marts on August 28, 1993. On his employment application, Walsh stated that the reason he left his prior position was "violation of company policy." Four months after being hired by Uni-marts, Walsh was promoted to store manager. On [*9] June 2, 1995, Walsh was promoted to supervisor. In connection with that promotion, Uni-Marts conducted a search of Walsh's driving record. The record showed a number of traffic violations. As a result, a Uni-Marts manager wrote a memo remarking that "His overall [sic] seems to indicate a disregard for rules and regulations." On March 22, 1996, Walsh was demoted from Supervisor to Store Manager.

Prior to exposing himself to Seldomridge, Walsh received a score of 188 out of a possible 200. This placed him in the top category of excellent, on a Management Personnel Performance Evaluation. The worksheet contains no evaluation criteria based on anti-discrimination or harassment prevention.

Prior to his employment with Uni-Marts, Walsh had a prior criminal history. n2 In 1995, an Information was filed by the Delaware Attorney General's Office charging Walsh with three counts of indecent exposure to girls under 16 years of age. The disposition of these charges is unavailable. In 1992, Walsh was charged with Felony Unlawful Sexual Contact Second Degree and Misdemeanor Indecent Exposure First Degree (indecent exposure to a girl under 16 years of age). He pled guilty to the misdemeanor charge [*10] and the Unlawful Sexual Contact charge was dismissed. In 1985, Walsh was charged with extortion. The disposition of this charge is unavailable. n3

n2 This information was retrieved through a criminal records check done at Seldomridge's re-

quest by Robert Shannon, a licensed private investigator.

n3 A pre-trial services report made in the 1992 case, also indicates that 1) Walsh received six months of unsupervised probation for two counts of Lewdness in 1991, 2) Walsh pled guilty and was fined for six counts of Indecent Exposure in 1990, and 3) Walsh was arrested in 1986 for Indecent Exposure (disposition unavailable). Outside of the report, there is no other evidence documenting these charges. Thus, it is not clear where, or even if, these incidents occurred.

D. Prior Sexual Harassment Claims Against Walsh

After the incident, Seldomridge learned of a prior sexual harassment allegation against Walsh from Tina Eastlake and her husband. On or about February 3, 1997, Tina Eastlake filed a complaint with the Delaware [*11] Department of Labor ("DDOL") alleging that Walsh sexually harassed her. Eastlake was a Uni-Marts employee who worked under Walsh. According to Eastlake the alleged harassment occurred on January 30, 1997. In her complaint, Eastlake stated that she and Walsh had enjoyed a casual dating relationship that ended in November of 1996. At that time, Eastlake informed Walsh that she did not wish to see him anymore. As a result of the relationship ending, Eastlake alleged that Walsh then subjected her to unfavorable treatment. In her complaint, Eastlake stated that she had advised Uni-Marts corporate officers of Walsh's conduct, however, she was not satisfied with their attempts to resolve the matter.

In response to Eastlake's allegations, Uni-Marts conducted its own investigation of her complaints. In a letter confirming a conversation with Eastlake on January 31, 1997, Amy Hunter ("Hunter"), Associate General Counsel for Uni-Marts, informed Eastlake that the grievance committee had met on several occasions regarding her grievance against Walsh. Hunter that stated that, "our final recommendation, after a thorough investigation is as follows. We would like to offer you a transfer to the Cecilton [*12] Store as an assistant manager. We understand that this will mean a longer commute for you. Therefore, we will also offer a fifty cent per hour wage increase to cover transportation costs."

In a letter from Hunter to Eastlake dated February 10, 1997, Hunter stated "We have tried for several weeks to address your concerns and come to some type of resolution." Hunter again offered Eastlake a transfer to the Cecilton store. She also offered Eastlake a full-time position in the same store, at the same pay rate, for the 11 p.m. to 7 a.m. shift. Hunter then stated that if Eastlake did not respond by February 14, 1997, the company

would assume that she had resigned. In a position statement to the DDOL, Uni-Marts claimed that Walsh "felt there were some problems with Tina's job performance. Specifically, certain tasks were being left undone and paperwork was left uncompleted." The Grievance committee felt that a change in managers would not be an acceptable solution because this would have called for others to be transferred as well.

The DDOL found "no reasonable cause to believe that Uni-Marts discriminated against Eastlake with respect to her sex and that reasonable cause does not exist [*13] to believe that Uni-Marts engaged in unlawful employment practices."

III. SUMMARY JUDGMENT STANDARD

[HN1] The court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Life Save Co., 206 F.3d 271, 278 (3d Cir. 2000); Knabe v. Boury Corp., 114 F.3d 407, 409 n.4 (3d Cir. 1997)* (both citing *Fed. R. Civ. P. 56(c)).* An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, *see Charlton v. Paramus Board of Educ., 25 F.3d 194, 197 (3d Cir. 1997),* and a fact is material if it could affect the outcome of the suit under governing law. *Id.* (citations omitted). [HN2] For the non-moving party to prevail on a motion for summary judgment, the party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." [*14] *See Knabe v. Boury, 114 F.3d at 409 n.4; Newsome v. Administrative Office of the Courts of the State of New Jersey, 103 F. Supp. 2d 807, 815 (D.N.J. 2000)* (stating that a failure to prove an essential element of the nonmoving party's case necessarily renders all other facts immaterial).

[HN3] In deciding a motion for summary judgment, "a court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor." *Knabe v. Boury, 114 F.3d at 409 n.4* (citing *Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir.1994)).* Moreover, it is not the province of the court to weigh the evidence and to decide the case on its merits; rather, the court shall simply determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202.*

With these standards in mind, the court will turn to the substance of Uni-Marts' motion for summary judgment.

2001 U.S. Dist. LEXIS 9491, *

## IV. DISCUSSION

In its briefing on the motion, Uni-Marts argues that it is entitled to summary judgment because Seldomridge cannot establish her claims for hostile work environment harassment or constructive **[*15]** discharge. In addition, Uni-Marts argues that Seldomridge cannot show that she is entitled to punitive damages. n4 In contrast, Seldomridge alleges that there are sufficient facts in the record from which a reasonable jury could rule in her favor on all of these issues. The court will address these issues in turn.

> n4 Uni-Marts also argues that, even assuming that a hostile work environment existed, it still has an affirmative defense to liability. However, because the court concludes that Seldomridge's hostile work environment claims fail as a matter of law, it need not address Uni-Marts' affirmative defense.

### A. Hostile Work Environment

[HN4] Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin." *42 U.S.C. § 2000e-2*(a)(1). n5 Although the statute mentions specific employment **[*16]** decisions with immediate consequences, it covers more than "terms" and "conditions" in the narrow contractual sense. *See Faragher v. City of Boca Raton, 524 U.S. 775, 786, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998).* Thus, sexual harassment that is so "severe or pervasive" as to "'alter the conditions of [the victim's] employment and create an abusive working condition violates Title VII. *Id.* (quoting *Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)); Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999)* (stating that it is well established that a plaintiff can prove a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment).

> n5 According to her complaint, Seldomridge filed a charge of discrimination with the DDOL on April 16, 1998 and May 8, 1998. She received a "right to sue" letter from the Equal Employment Opportunity Commission on May 6, 1999, and subsequently filed her complaint eighty-nine days later on August 3, 1999. Thus, Seldomridge has established that she complied with all of Title VII's pre-filing requirements in a timely manner. *See 42 U.S.C. § 2000e-5*(e)(1) (affording a plain-

tiff 180 day to file a charge of discrimination with either the appropriate state or federal agency and 90 days to file suit after receiving a right to sue letter).

**[*17]** [HN5]

Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment. *Meritor Savs. Bank FSB v. Vinson, 477 U.S. 57, 65, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986).* In order to fall within the purview of Title VII, the conduct in question must be severe or pervasive enough to create both an "objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile," and an environment the victim-employee subjectively perceives as abusive or hostile. *See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 126 L. Ed. 2d 295, 114 S. Ct. 367, (1993).* n6

> n6 The Supreme Court reaffirmed Harris' "severe and pervasive" test in *Faragher v. City of Boca Raton, 524 U.S. 775, 783, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998),* and *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).*

In this case, **[*18]** Seldomridge argues that she was subjected to a hostile work environment when Walsh exposed himself to her on January 16, 1998. In addition, Seldomridge also argues that she was subjected to a hostile work environment when she returned to work after the incident. The court will address these arguments in turn.

#### 1. Claim Based on the January 16, 1998 Incident

[HN6] In deciding a hostile work environment claim, the court must examine the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23.* [HN7] In order to establish a hostile work environment claim, a plaintiff must show that:

> (1) the plaintiff suffered intentional discrimination because of their sex,
> (2) the discrimination was pervasive or regular, n7

(3) the discrimination detrimentally affected the plaintiff,

(4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and

(5) the existence of respondeat superior liability.

*See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482-83 (3d Cir. 1990).* [*19] *See also Weston v. Pennsylvania, 251 F.3d 420, 2001 WL 539470,* at *3-4 (3d Cir. 2001); *Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir.1999).*

> n7 Although the *Andrews* test states that the conduct must be "severe and pervasive," the Supreme Court's decisions in *Faragher* and *Ellerth* emphasize that actionable conduct can also be severe or pervasive. *See, e.g., Pittman v. Continental Airlines, Inc., 35 F. Supp. 2d 434, 441 (E.D. Pa. 1999)* (explaining same).

In this case, there is no dispute as to the first, third, and fifth factors of the *Andrews* test. As to the first prong, Walsh's conduct was motivated by Seldomridge's sex or gender. n8 As to the third prong, there is evidence in the record to support Seldomridge's claim that, from a subjective viewpoint, she was detrimentally affected. Specifically, Seldomridge claims that she sought the counsel of her therapist about the incident, and that she was troubled enough to immediately report [*20] the incident to the police. Finally, as to the fifth prong, because Walsh was Seldomridge's immediate supervisor, Uni-Marts would be vicariously liable for his conduct. n9 *See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998); Faragher v. City of Boca Raton, 524 U.S. at 777-78* ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."). Therefore, the court will focus its inquiry on whether Walsh's conduct was sufficiently severe or pervasive and whether it would objectively detrimentally affect a reasonable person in Seldomridge's position.

> n8 For the purposes of Title VII, "sex" and "gender" are not considered to be distinct concepts. *See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 148 (3d Cir. 1999).*

> n9 As the court has stated, it is clear that under the Supreme Court's decisions in *Ellerth* and *Faragher,* Uni-Marts would be vicariously liable for Walsh's conduct. However, Seldomridge also suggests that Uni-Marts is directly liable under Title VII because of its own negligence in hiring and retaining Walsh.
>
> In *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257,* the Supreme Court explained that an employer may be liable for a supervisor's harassing conduct either directly or indirectly. *See id. at 758-760.* An employer will be directly liable for a supervisor's harassment when the employer either intended, or negligently permitted, the tortious conduct to occur. *Id. at 759.* ("Thus, although a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment."); *Dees v. Johnson Controls World Services, Inc,. 168 F.3d 417, 421 (11th Cir. 1999)* (explaining same). *See also Anderson v. Deluxe Homes of PA, Inc., 131 F. Supp. 2d 637, 647 n.10 (M.D. Pa. 2001)* (explaining that respondeat superior liability could depend "on whose behavior is at issue, that of the supervisor or the employer itself").
>
> The court need not address this issue, however, because it finds that Walsh's hostile work environment claim fails because the conduct was not severe enough to be actionable under Title VII. In addition, the court need not decide whether Uni-Marts was negligent in hiring Walsh because Seldomridge has failed to allege any state law claims for negligent hiring or retention. *See e.g., A. R. Anthony & Sons v. All-State Investigation Sec. Agency, Inc., 1983 Del. Super. LEXIS 647, *5 (Del. Super. Ct. Sept. 27, 1983)* (explaining that an employer is liable for negligent hiring when it has "reason to know or in the exercise of reasonable care should have known that an employee has an undue tendency to cause harm"). However, the court does note that Seldomridge has not cited to one case which interprets Title VII as mandating that an employer conduct a criminal background investigation into every employee. *But see e.g., Bryant v. Better Business Bureau of Greater Maryland, 923 F. Supp. 720, 752 (D. Md. 1996)* (explaining that "Even where the employer knows of a criminal record and still hires the employee, this does not automatically make out a prima facie case of negligent hiring. Instead, it depends upon the nature

Case 1:05-cv-00716-GMS    Document 26    Filed 09/18/2006    Page 41 of 55

Page 9
2001 U.S. Dist. LEXIS 9491, *

of the criminal record and the surrounding circumstances.") (citations omitted). Thus, although there is evidence that Walsh had a criminal record, Seldomridge has failed to adduce any evidence which would demonstrate that Uni-Marts should have known about Walsh's background. *See id.* (granting summary judgment to defendants where a plaintiff failed to demonstrate with sufficient specificity that the defendants should have known about another employee's criminal background).

**[*21]**

Uni-Marts maintains that because Walsh's exposure to Seldomridge was a single, isolated incident, she cannot establish a hostile work environment as a matter of law. [HN8] In general, an isolated incident of sexual misconduct is not actionable under Title VII. *Clark Cty. School District v. Breeden, 532 U.S. 268, 149 L. Ed. 2d 509, 121 S. Ct. 1508, 1510 (2001)* (citing *Faragher, 524 U.S. at 788); Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 482 (3d Cir. 1997).* In exceptional cases, however, an isolated incident may be actionable under Title VII if it is extremely serious such that it alters the terms and conditions of employment to create a hostile or abusive work environment. *See Meritor, 477 U.S. at 67.* In other words, a single incident may support a claim for hostile work environment sexual harassment if the incident is "of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work . . . ." *LaRose v. Philadelphia Newspapers, Inc., 21 F. Supp. 2d 492,* (E.D. Pa. 1998). For example, a single incident of physical assault or offensive **[*22]** touching has been held to be sufficiently severe to support a hostile work environment claim. *See e.g., Grozdanich v. Leisure Hills Health Center, Inc., 25 F. Supp. 2d 953, 969-70 (D. Minn. 1998)* (holding that a reasonable jury could find that an isolated incident of sexual assault created a hostile work environment). n10 *See also Jones v. United States Gypsum, 2000 U.S. Dist. LEXIS 2700,* No. C99-3047-MWB; *2001 WL 196616,* at *4 (N.D. Iowa Jan. 31, 2000) (holding that single incident of offensive touching may be severe enough to support a hostile work environment claim).

> n10 Citing *Todd v. Ortho Biotech, Inc., 138 F.3d 733, 736 (8th Cir. 1998)* (single attempted rape at national sales meeting held sufficiently severe misconduct to be actionable); *Guess v. Bethlehem Steel Corp., 913 F.2d 463, 464 (7th Cir. 1990)* (single incident where supervisor picked up plaintiff and forced her face against his crotch impliedly considered to create hostile environment); *Fall v. Indiana University Bd. of*

*Trustees, 12 F. Supp. 2d 870, 879 (N.D. Ind. 1998)* (single assault, involving a groping of intimate areas, may create hostile environment).

**[*23]**

Furthermore, [HN9] in determining whether a plaintiff-employee has been subjected to a hostile work environment, the court not only looks to the regularity or severity of allegedly harassing conduct, but also must look to the fourth factor of the *Andrews* test, and determine whether the conduct would detrimentally affect a reasonable person. *See Anderson v. Deluxe Homes of Pa, Inc., 131 F. Supp. 2d 637, 646 (E.D. Pa. 2001).* n11 After all, "not all workplace conduct that may be described as harassment affects a '"term, condition or privilege of employment."' *Kantar v. Baldwin Cooke Co., 1995 U.S. Dist. LEXIS 17330,* at *10, No. 93 C 6239 (N.D. Ill. Nov. 13, 1995) (citing *Harris v. Forklift Systems, Inc., 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).* The purpose of including the objective standard is to "protect[] the employer from the hypersensitive employee [while] still serving the goal of equal opportunity by removing the walls of discrimination that deprive women of self-respecting employment." *Andrews, 895 F.2d at 1483; see also Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586 (11th Cir. 2000)* **[*24]** ("But a plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it interferes with job performance. If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee, and the standard would not have an objective component.").

> n11 Evidence that others were harassed may serve to bolster the objective reasonableness of a plaintiff's claims. *Anderson, 131 F. Supp. 2d at 646* (citing *West v. Philadelphia Electric Co., 45 F.3d 744, 757 (1995).* Although there is evidence in the record concerning another complaint about Walsh, the court will not consider Tina Eastlake's allegations of harassment because Seldomridge has stated that she did not learn of Eastlake's complaints until well after the incident. *See, e.g., Hirase-Doi v. U.S. West Comms., Inc., 61 F.3d 777, 782 (10th Cir. 1995)* (explaining that a plaintiff may rely only on evidence relating to harassment of which she was aware during her employment). In addition, considering that Eastlake's alleged *quid pro quo* harassment claim arose within the context of an affair she had with Walsh and did not involve the type of conduct at issue with Seldomridge (i.e. exposure), the court will not consider the Eastlake complaint in de-

2001 U.S. Dist. LEXIS 9491, *

termining whether Seldomridge's claims are objectively reasonable.

[*25]

Even construing the evidence in the record in Seldomridge's favor, the court concludes that Walsh's brief exposure to Seldomridge was not so severe that it altered the terms and conditions of her employment. n12 In determining whether Walsh's conduct was so severe that it changed the conditions of Seldomridge's employment, the court is mindful that it must look to the totality of the circumstances. Under the totality of the circumstances of this case, the court concludes that Seldomridge's claim must fail as a matter of law. In particular, the court notes that Seldomridge thought Walsh was joking when he said he would be coming out of the bathroom wearing "nothing but a cigarette." Although Seldomridge characterizes this conduct as offensive and inappropriate, she does not suggest that she felt threatened by Walsh's conduct leading up to the exposure. *See Slaughter v. Waubonsee Comm. Coll., 1995 U.S. Dist. LEXIS 14236,* *12, No. 94 C 2525 (N.D. Ill. Sept. 29, 1995). Also, Seldomridge stated that she only saw Walsh naked for a few seconds from about 30 feet away and Walsh immediately retreated to the store room area. Seldomridge does not allege that Walsh tried to [*26] keep her from leaving the store, or even that he tried to approach her. In addition, it is undisputed that Uni-Marts immediately and effectively dealt with Walsh's conduct. Thus, this brief incident, which Seldomridge concedes was quickly and effectively resolved, cannot be said to have unreasonably interfered with her work performance. *See Mathers v. Sherwin-Williams Co., 2000 U.S. Dist. LEXIS 3716,* *28, Civ. A. NO. 97-5138 (E.D. Pa. Mar. 27, 2000) (affirming an arbitrator's conclusion that the plaintiff failed to meet the objective prong of the *Andrews* test because a "reasonable person would [not] have found this one-time comment, in the context in which it occurred and as it was subsequently addressed by [the defendant], to be severe and pervasive enough to have resulted in a hostile or abusive work environment.").

n12 Seldomridge also stated that before the incident Walsh made her uncomfortable at work by saying that he thought she was pretty, he would like to "rock her world" and by making other "stupid, off-the wall comments." Interestingly, Seldomridge does not argue that these comments contributed to her hostile work environment claim. However, even if Seldomridge did argue that Walsh's comments and the one-time incident created a hostile work environment, the court concludes that under the totality of the circumstances, Seldomridge still cannot establish

an actionable claim under Title VII. It is well established that "simple teasing, offhand comments, and isolated incidents will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher, 524 U.S. at 788* (citations omitted). *See e.g., Bishop v. National Railroad Passenger Corp., 66 F. Supp. 2d 650, 663 (E.D. Pa. 1999)* (holding that staring, leering and suggestive comments were neither severe nor pervasive, nor sufficiently detrimental to create a hostile work environment); *Pittman v. Continental Airlines, Inc., 35 F. Supp. 2d 434, 442 (E.D. Pa. 1999)* (holding that occasional encounters with graphic sexual conversation and personal questions failed to create an atmosphere that would have an "objectively detrimental effect on a reasonable person in her position").

[*27]

In light of the evidence in the record, the court concludes that no reasonable fact finder could return a verdict for Seldomridge on her hostile work environment claim. Although Walsh's brief onetime exposure may have been offensive and inappropriate, it was not so severe or extremely serious, under the totality of the circumstances, that it altered the conditions of Seldomridge's employment. *See e.g., Bauder v. Wackenhut Corp., 2000 U.S. Dist. LEXIS 4044, Civ. A. 99-1232, 2000 WL 340191,* at *4 (E.D. Pa. Mar. 23, 2000) (holding that a one time incident where supervisor grabbed plaintiff employee's behind did not sufficiently support a hostile work environment claim); *DeCesare v. National Passenger Railroad Corp., 1999 U.S. Dist. LEXIS 7560, No. CNA 98-3851, 1999 WL 330258,* at *3 (E.D. Pa. May 24, 1999); *Pittman, 35 F. Supp. 2d at 442; Bishop, 66 F. Supp. 2d at 664; Porta v. Dukes, 1998 U.S. Dist. LEXIS 12325, No. Civ. A 98-2721, 1998 WL 470146,* at *2 (E.D. Pa. Aug. 11, 1998). n13 *See also Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998)* n14 (affirming grant of summary judgment to defendant where plaintiff's hostile work environment claim was based [*28] upon a single incident of breast touching and one lewd comment).

n13 Both *DeCesare* and *Porta* cite to several other cases where a single incident was found to be insufficient to support a hostile work environment claim. These cases include: *Koelsch v. Beltone Electronics Corp., 46 F.3d 705, 708 (7th Cir. 1995)* (finding no hostile environment existed where the company president rubbed the plaintiff's leg, grabbed her buttocks, and asked her for dates); *Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 534-35 (7th Cir.1993)* (finding

that there was no hostile environment where the plaintiff's supervisor put his hand on the plaintiff's leg and kissed her until she pushed him away, and on another occasion the supervisor lurched at the plaintiff and tried to grab her); *Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir.1993)* (holding that there was no hostile work environment where supervisor asked the plaintiff for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her); *Cooper-Nicholas v. City of Chester, 1997 U.S. Dist. LEXIS 20810, No. 95-6493, 1997 WL 799443* (E.D.Pa. Dec. 30, 1997) (supervisor's sexual comments over nineteen months were not frequent or sufficiently severe to create a hostile work environment).

**[*29]**

n14 In particular, the court in *Quinn* noted that: "Though the two incidents in question--[supervisor's] comment, apparently regarding [plaintiff's] posterior, and his use of papers held in his hand to touch her breasts--are obviously offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [plaintiff's] work environment. Nor are these incidents, together or separately, of sufficient severity to alter the conditions of [plaintiff's] employment without regard to frequency or regularity." *Id.* at 768

2. Claim Based on Conduct of Co-Workers and Customers After Seldomridge Returned to Work

Seldomridge also argues that the actions of a co-worker, Teddy, and certain customers after her return to work constituted actionable sexual harassment. Again, the court looks to the factors established by the Third Circuit to determine whether Seldomridge can establish a hostile work environment claim. In particular, the court must look to see if: (1) the plaintiff suffered intentional discrimination because of **[*30]** their sex, (2) the discrimination was pervasive or regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability. *See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).*

The parties dispute whether Seldomridge can establish the first prong of the test. In particular, Uni-Marts argues that, even accepting all facts in the record as true,

Seldomridge cannot establish that the conduct of Teddy and the customers was motivated by Seldomridge's sex or gender. The court agrees. [HN10] While sexual overtones are not necessary to show discrimination because of the plaintiff's sex, the offending conduct must nonetheless be motivated by a plaintiff's sex or gender. *See Durham Life Ins. Co. v. Evans, 166 F.3d at 148* (citing *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)).* After all, Title VII is not a "general civility code." *Faragher, 524 U.S. at 788.* "Ordinary tribulations of the workplace, such as the sporadic use of abusive **[*31]** language, gender-related jokes, and occasional teasing" are not actionable. *See Id.* Moreover, [HN11] "Title VII is not a shield against harsh treatment in the workplace; it protects only in instances of harshness disparately distributed." *Swingle v. Henderson, 142 F. Supp. 2d 625, 2001 WL 483317,* at *12 (D.N.J. 2001) (quoting *Jackson v. City of Killeen, 654 F.2d 1181, 1186 (5th Cir.1981)).* In particular, allegedly harassing conduct that is motivated by a bad working relationship, by a belief that the plaintiff has in some way acted improperly, or even by personal animosity is not actionable under Title VII. *See Koschoff v. Henderson, 109 F. Supp. 2d 332, 345-46 (E.D. Pa. 2000).* Based on the record before it, the court concludes that a reasonable jury could not find that the teasing Seldomridge suffered was motivated by her gender. n15

n15 Although the court will not address the second, third, and fourth factors articulated in *Andrews,* it notes that the conduct of Teddy and certain customers simply does not rise to the level of severity or pervasiveness that is required by Title VII. "A recurring point in these opinions is that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton, 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)* (citations omitted). Moreover, Title VII is not "designed to protect the overly sensitive plaintiff." *See Bishop, 66 F. Supp. 2d at 664* (citing *Harley v. McCoach, 928 F. Supp. 533, 539 (E.D. Pa. 1996)).*

**[*32]**

In addition, Seldomridge's hostile work environment claim fails because she cannot establish respondeat superior liability. Although the Supreme Court has not address hostile work environment claims arising from the actions of a co-worker, the Third Circuit's decision in *Kunin v. Sears Roebuck and Co., 175 F.3d 289 (3d Cir. 1999),* is controlling on this issue. *Kunin* examined the scope of respondeat superior liability for hostile work

environment claims based on the actions of a co-worker. *Id. at 290.* Under *Kunin*, [HN12] employer "liability exists where the defendant [employer] knew or should have known of the harassment and failed to take prompt remedial action." *175 F.3d at 293-94.* In this case, Seldomridge maintains that during the time period that the alleged harassing behavior of Teddy and the customers occurred, "the manager there already knew . . . . How Teddy was acting with me, how the customers were." Seldomridge Deposition, at 111. After carefully reading through the record, this appears to be Seldomridge's sole basis for her respondeat superior claim. Because Seldomridge has admitted that she did not attempt to lodge a complaint [*33] with anyone in management at Uni-Marts, it appears that Seldomridge is arguing that Uni-Marts had constructive notice of the allegedly harassing conduct.

Under *Kunin*, [HN13] an employer would have constructive notice in two situations: 1) where an employee provides a supervisor with enough information to raise the probability of sexual harassment in the minds of a reasonable employer or 2) where harassment is so pervasive and open that a reasonable employer would have had to be aware of it. *See id. at 294* (citing *Zimmerman v. Cook County Sheriff's Dep't, 96 F.3d 1017, 1018-19 (7th Cir. 1996)).* Even construing the facts in the record in the light most favorable to Seldomridge, the court cannot find that Uni-Marts had constructive notice of the alleged harassing conduct.

First, Seldomridge has provided no evidence in the record to show that she provided her supervisor with enough information to raise a probability of sexual harassment in the minds of a reasonable employer. In *Kunin*, the employee claimed that by asking whether "'cursing was allowed on the sales floor,'" she provided her employer with notice of sexual harassment. *Id.* There was also [*34] evidence in *Kunin* that the employee's supervisor heard rumors about "offensive language in his department but never investigated them." *Id.* The *Kunin* court held that this evidence could not establish that the employer had constructive notice of sexually harrasing behavior. *Id.* In particular, the court reasoned that because the employee's complaint did not communicate sexually offensive behavior and the evidence of rumor did not refer to gender-specific harassment, the employee had failed to establish that the employer was on constructive notice. *175 F.3d at 294-95.* In this case, Seldomridge admits that she failed to even lodge a complaint with her supervisor about the alleged harassment. Also, as the court has already discussed, the allegedly harassing conduct was not gender specific.

As for the second type of situation that can support a finding of constructive notice, Seldomridge simply has not alleged the type of open and pervasive harassment that would put a reasonable employer on constructive notice. Seldomridge has shown, at best, that she was subjected to off-hand teasing and that one co-worker and a customer failed to "believe her" about the Walsh incident. [*35] However, she has also clearly stated that all of her other co-workers believed her (including her supervisor) and were supportive of her regarding the incident with Walsh. Moreover, as the court has already noted, Seldomridge has not shown that this harassment was motivated by her gender. In light of these facts, Seldomridge cannot show that the conduct was so open and pervasive that a reasonable employer would have had constructive notice of a hostile working environment. *See Kunin*, 175 at 295 (holding management had little opportunity to discover the harassment because it was not open and pervasive). n16

> n16 Moreover, it would be unreasonable to hold Uni-Marts liable for the conduct of Teddy and certain customers in light of the record. It is undisputed that Seldomridge had already used Uni-Marts' sexual harassment policy regarding the Walsh incident. Thus, Seldomridge could have easily provided Uni-Marts with actual notice. *See Bishop, 66 F. Supp. 2d at 666-67* (holding that an employer could not be held liable for conduct of co-workers where there was a reasonable avenue for making a complaint available to the plaintiff, and the employer had no notice of co-worker's conduct).

[*36]

Thus, because Seldomridge has failed to show that there are facts in the record which would show that Uni-Marts had either actual or constructive notice of the alleged harassing conduct, Seldomridge cannot establish that Uni-Marts is liable under a respondeat superior theory regarding the conduct of her co-worker, Teddy, and certain customers.

B. Constructive Discharge

Seldomridge has also alleged that she was constructively discharged from her position at Uni-Marts. n17 In particular, Seldomridge alleges that following the Walsh incident, the harassing conduct of her co-worker Teddy and certain customers was so severe that it forced her to quit her job approximately one month after returning to work. After quitting, Seldomridge went to work at an establishment called the Eating Post.

> n17 In her complaint, Seldomridge alleges that she suffered from harassment resulting in a tangible employment action. *See D.I. 1, PP39-41.*

When a supervisor creates a hostile work environment and takes a tangible employment action against a victimized employee, the employer is not entitled to raise an affirmative defense. *See Faragher v. City of Boca Raton, 524 U.S. at 777-78.* In this case, Seldomridge argues that she suffered a tangible employment action in that she was constructively discharged from her position at Uni-Marts. The Third Circuit has held that in certain instances, a constructive discharge can be a tangible employment action. *See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 156 (3d Cir. 1999)* (declining to adopt a blanket rule that a constructive discharge constitutes a tangible employment action). Because the court has determined that Seldomridge cannot establish her hostile work environment claims, it need not address whether Uni-Marts would be entitled to assert an affirmative defense. However, the court will still address Seldomridge's constructive discharge claim because she has also alleged, as a separate and independent cause of action, that she was constructively discharged. See D.I. 1, PP35-38.

**[*37] [HN14]**

A plaintiff who voluntarily resigns may maintain a case of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge. *See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1075 (3d Cir. 1996)* (citing *Gray v. York Newspapers, Inc, 957 F.2d 1070, 1079 (3d Cir. 1992)).* In determining if a constructive discharge has occurred the court should apply an objective test. *Id.* That is, whether "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id.* (quoting *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996)* and *Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir. 1984)).* Thus, a plaintiff must demonstrate that from an objective viewpoint, the employer condoned acts of discrimination which would violate Title VII. *See Maher v. Associated Services for the Blind, 929 F. Supp. 809, 814 (E.D. Pa. 1996).* However, "the mere fact that the plaintiff feels uncomfortable or considers her working **[*38]** environment unduly stressful is an insufficient basis for a constructive discharge claim." *Id.* (citing *Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)); see also McLaughlin v. Rose Tree Media School District, 52 F. Supp. 2d 484, 493 (E.D. Pa. 1999)* ("more than subjective perceptions of unfairness or harshness or a stress-filled work environment are required").

Viewing the record in the light most favorable, the court concludes that Seldomridge cannot establish that she was constructively discharged as a matter of law. First, as the court has already explained with regard to her hostile work environment claim, Seldomridge has not shown that Uni-Marts intentionally made her working conditions intolerable, or even that Uni-Marts should have been aware of the teasing. Second, it would not be reasonable in this case to assume that Seldomridge had no other option but to quit. *See Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)* (explaining that "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option"). In **[*39]** light of Seldomridge's prior use of the sexual harassment policy, it is clear that she could have again called the toll-free number that she used to complain about Walsh. Although Seldomridge alleges that she didn't know she could use the number for the purpose of complaining about her co-worker's conduct, her mistaken belief cannot negate the fact that Uni-Marts was neither aware of, nor responsible for, the conduct of her co-workers. Finally, as the court has already stated, Seldomridge's vague descriptions of the allegedly harassing conduct simply cannot be construed as "intolerable" to a reasonable person. Based on this record, no reasonable trier of fact could determine that Uni-Marts knowingly made Seldomridge's working conditions intolerable, or that her working conditions were so intolerable that a reasonable person would have been forced to quit. *See e.g., Williams v. Caruso, 966 F. Supp. 287, 298 (D. Del. 1997)* (J. Schwartz) (holding that facts in the record did not support claim that employer knowingly permitted conditions of discrimination). n18

n18 In her complaint, Seldomridge also alleges that she is entitled to punitive damages as a separate cause of action. D.I. 1, PP 42-43. However, [HN15] *42 U.S.C. § 1981a* "does not, either expressly or impliedly, create an additional, separate and independent cause of action for employment discrimination plaintiffs, but merely adds to the damages available to such plaintiffs under Title VII." *West v. Boeing Co., 851 F. Supp. 395, 398 (D. Kan. 1994). See also Singh v. Wal-Mart Stores, Inc., 1999 U.S. Dist. LEXIS 8531, No. Civ. A. 98-1613, 1999 WL 374184, *8* (E.D. Pa. June 10, 1999). Thus, because Seldomridge cannot establish her Title VII claim, she is not entitled to punitive damages. *See also id.* at 399 ("section 1981a clearly 'adds to the damages available to a plaintiff who shows, under Title VII, that she was the victim of intentional dis-

2001 U.S. Dist. LEXIS 9491, *

crimination in employment.'") (citing *Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1994)).*

[*40]

### V. CONCLUSION

For the foregoing reasons, the court concludes that Uni-Marts is entitled to summary judgment because Seldomridge cannot establish her claims of hostile work environment harassment or constructive discharge as a matter of law.

For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:

1. Pursuant to *Rule 56(e) of the Federal Rules of Civil Procedure*, Uni-Marts' Motion for Summary Judgment (D.I. 79) is GRANTED.

2. Summary Judgment be and hereby is ENTERED in favor of Uni-Marts and against Seldomridge on all claims in the complaint.

Date: July 10, 2001

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE 2004 U.S. APP. LEXIS 16576

**LAURA ZELINSKI, Appellant. v. PENNSYLVANIA STATE POLICE; COMMONWEALTH OF PENNSYLVANIA, THE; LOU ALTIERI, RICHARD WEINSTOCK**

No. 03–4025

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*108 Fed. Appx. 700; 2004 U.S. App. LEXIS 16576*

**May 24, 2004, Argued**
**August 11, 2004, Opinion Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. Civ. No. 01-cv-01979). Chief. District Judge: Honorable Thomas J. Vanaski.

*Zelinski v. Pa. State Police, 2004 U.S. App. LEXIS 21235 (3d Cir. Pa., Aug. 11, 2004)*

**DISPOSITION:** Affirmed in part, vacated in part and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant, state trooper, challenged a judgment of the United States District Court for the Middle District of Pennsylvania which granted summary judgment in favor of appellees, the state police, the commonwealth, a co-worker, and a supervisor, on the trooper's claims for, inter alia, sexual discrimination and retaliation brought pursuant to *42 U.S.C.S. § 1983* and the First Amendment.

**OVERVIEW:** Almost immediately after the trooper became a member of the state police's specialized drug investigation unit, her co-worker began sexually harassing her. After several months, the trooper told her supervisor that she did not feel comfortable working with the co-worker. Later the trooper was transferred to another unit where she lost neither rank nor pay as a result. After the transfer, the trooper filed a written sexual harassment complaint with the state police and state human relations

agency. The district court concluded that the trooper presented no evidence to suggest that her co-worker was the trooper's superior when he engaged in the alleged acts of sexual harassment. The district court's grant of summary judgment in favor of the co-worker on the *42 U.S.C.S. § 1983* claim was proper. The district court held that there was no genuine issue of material fact as to hostile work environment because the harassment the trooper suffered was not severe or pervasive enough. Neither the form, context, nor content of the trooper's speech supported a finding that it addressed a matter of public concern, and her First Amendment claim was properly dismissed.

**OUTCOME:** The district court's judgment was vacated in part and remanded in part.

**CORE TERMS:** summary judgment, sexual harassment, retaliation, trooper, protected activity, harassment, suggestive, causation, hostile work environment, unusually, reasonable jury, genuine issue of material fact, conversation, supervisory, pervasive, severe, search warrant, period of time, subjected, vacate, matter of public concern, causal connection, elected official, nonmoving party, non-supervisory, discriminatory, inappropriate, co-worker, exposed, patrol

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Appeals > Appellate Jurisdiction > General Overview*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] The appellate court has jurisdiction to hear an appeal pursuant to *28 U.S.C.S. § 1291*. An appellate

court exercises plenary review over a district court's grant of summary judgment.

***Civil Procedure > Summary Judgment > Standards > Legal Entitlement***
***Civil Procedure > Summary Judgment > Standards > Materiality***
[HN2] Summary judgment should be granted if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A fact is "material" if its existence or nonexistence might affect the outcome of the suit under the applicable law. Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

***Civil Rights Law > Section 1983 Actions > Scope***
[HN3] In order to sustain a claim under *42 U.S.C.S. § 1983*, a claimant must establish that a person, acting under the color of state law, has deprived her of a right secured by the United States Constitution. A finding of liability under *42 U.S.C.S. § 1983* requires that the defendants have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. Generally, in order to act under the color of state law, the wrongdoer must be in a supervisory position in relation to the plaintiff.

***Civil Rights Law > Section 1983 Actions > Scope***
[HN4] See *42 U.S.C.S. § 1983*.

***Civil Rights Law > Section 1983 Actions > Scope***
[HN5] Courts look at the substance of an individual defendant's job functions, rather than the form, to determine whether an employee is acting in a supervisory capacity for purposes of employment discrimination claims under *42 U.S.C.S. § 1983*. The two primary factors the court examined to determine whether there is de facto supervisory control are (1) whether the defendant can alter the plaintiff's workload, and (2) whether the plaintiff would face charges of insubordination for failure to obey the defendant's order.

***Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements***
***Environmental Law > Environmental Justice***

***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview***
[HN6] A plaintiff can establish a violation of Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e* et seq., by proving that discrimination based on sex has created a hostile or abusive work environment. However, not all work place conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII. When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."

***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview***
[HN7] A totality of the circumstances test determines whether the threshold level of severity and pervasiveness has been reached. The severity of the harassment, the frequency of the harassment, and the degree of abuse are factors courts should consider.

***Evidence > Procedural Considerations > Burdens of Proof > Initial Burden of Persuasion***
***Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities***
***Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employment Practices > General Overview***
[HN8] The initial burden of proving a prima facie case of discriminatory retaliation. A plaintiff must demonstrate that (1) she engaged in a Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., protected employee activity, (2) the employer takes an adverse employment action against her, and (3) there is a causal link between the engaged protected activity and the adverse employment action.

***Labor & Employment Law > Discrimination > Actionable Discrimination***
***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employees***
[HN9] Protected activities under Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e* et seq., protected employee include situations where an employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under. Title VII. *42 U.S.C.S. § 2000e-3(a)*. A formal letter of complaint to an employer or the Equal

108 Fed. Appx. 700, *; 2004 U.S. App. LEXIS 16576, **

Employment Opportunity Commission is not the only way to meet the protected activity criterion. Protected activities include formal charges of discrimination, as well as informal protests of discriminatory employment practices, including making complaints to management. It is necessary to analyze the message conveyed, rather than "the medium of conveyance."

*Labor & Employment Law > Discrimination > Retaliation > General Overview*

[HN10] Temporal proximity alone is insufficient to establish the required causal connection in retaliation cases when temporal proximity is not "unusually suggestive." When there may be a valid reason why the adverse employment action is not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*

[HN11] A discharge occurring two days after a plaintiff has filed an Equal Employment Opportunity Commission complaint is "unusually suggestive." By itself, a nineteen-month span of time was considered too long a period to be "unusually suggestive."

*Labor & Employment Law > Discrimination > Retaliation > General Overview*

[HN12] A plaintiff can also establish the causation element for a retaliation claim by providing evidence of inconsistent reasons for the adverse employment action.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*

[HN13] The expressive rights of public employees are more restricted that those of public citizens who are not in an employment relationship with the government. A public employee's speech is protected only if it relates to a matter of public concern, i.e., if it is important to the process of self-governance that communications on this topic, in this form and in this context, take place.

**COUNSEL:**

For LAURA ZELINSKI, Appellant: Spero T. Lappas, Serratelli, Schiffman, Brown & Calhoun, Harrisburg, PA.

For PA STATE POL, COMM OF PA, LOU ALTIERI, Appellees: Sarah C. Yerger, Office of the Attorney General of Pennsylvania, Harrisburg, PA.

For RICHARD WEINSTOCK, Appellee: James P. Golden, Jane B. LaPorte, Hamburg & Golden, Philadelphia, PA.

**JUDGES:** Before: ROTH, STAPLETON, Circuit Judges, SCHWARZER,* Senior District Judge.

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

**OPINION BY:** ROTH

**OPINION:** [*702] ROTH, Circuit Judge:

Trooper Laura Zelinski brought an action against the Pennsylvania State Police (PSP), the Commonwealth of Pennsylvania, Corporal Lewis Altieri, and Trooper Richard Weinstock (both employees of the PSP), pursuant [**2] to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-2000e-17 (West 2004)*, the Pennsylvania Human Relations Act, *43 PA. CONS. STAT. ANN. § 955* (West 2004), and *42 U.S.C. § § 1983, 1985*, and *1988*. Zelinski's claims arise out of alleged incidents of sexual harassment and discrimination. For the reasons that follow, we will affirm in part and reverse in part.

**I. FACTUAL AND PROCEDURAL HISTORY**

Zelinski became a member of the PSP specialized drug investigation unit, known as the Tactical Narcotics Team (TNT) unit, in May of 1999. According to Zelinski, Trooper Weinstock began sexually harassing her almost immediately. After several months, Zelinski told her supervisor, Corporal Altieri, that she did not feel comfortable working with Weinstock. She related to Altieri the incidents of sexual harassment and told Altieri that she did not want anything to be done about them. Zelinski maintains that Altieri subsequently subjected her to unfair criticism because Altieri favored Weinstock.

Beginning in the fall of 1999, there was significant tension within the TNT unit, much of it the result of individual [**3] members' problems with Trooper Weinstock. Altieri, head of the unit, informed his immediate supervisor, Sergeant Michael Ruda, about the unit's problems. Once this information went through the appropriate chain of command, Captain John Duignan recommended that Zelinski and another TNT member be removed from the unit. In August 2000, Major Tyree Blocker transferred Zelinski from the TNT unit. Zelinski lost neither rank nor pay as a result of the transfer. After the transfer, Zelinski filed a written sexual harassment complaint with

the PSP's Equal Opportunity Officer. On November 15, 2000, she filed a complaint with the Pennsylvania Human Relations Commission. After receiving a right to sue letter, Zelinski brought this action.

Zelinski filed an action in the District Court for the Middle District of Pennsylvania against the PSP, the Commonwealth of Pennsylvania, Corporal Lewis Altieri, and Trooper Richard Weinstock, bringing claims pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-2000e-17 (West 2004)*, the Pennsylvania Human Relations Act, *43 PA. CONS. STAT. ANN. § 955* (West 2004), and *42 U.S.C. § § 1983,* [**4] *1985,* and *1988.* Weinstock filed a motion to dismiss, and all defendants filed motions for summary judgment. The District Court denied Weinstock's motion to dismiss but granted the defendants' motions for summary judgment on all claims. Zelinski appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

[HN1] We have jurisdiction to hear this appeal pursuant to *28 U.S.C. § 1291.* We exercise plenary review over a District Court's grant of summary judgment. *Assaf v. Fields, 178 F.3d 170, 171 (3d. Cir. 1999).* [HN2] Summary judgment should be granted if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* A fact is "material" if its existence or nonexistence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* "Summary judgment will not lie if the [*703] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* [**5]

## III. DISCUSSION

### A. Summary Judgment in favor of Trooper Weinstock on the *42 U.S.C. § 1983* claim

Zelinski claims that the District Court erred in granting summary judgment in favor of Weinstock on her *§ 1983* claim. [HN3] In order to sustain a claim under *42 U.S.C. § 1983* n1, Zelinski must establish that a person, acting under the color of state law, deprived her of a right secured by the Constitution. *Renda v. King, 347 F.3d 550, 557 (3d Cir. 2003).* "A finding of liability under *42 U.S.C. § 1983* requires that the defendant . . . have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Bonenberger v. Plymouth Township, 132 F.3d 20, 23 (3d Cir. 1997)* (internal quotations and citations omitted). Generally, in order to act under the color of state law, the wrongdoer must be in a supervisory position in relation to the plaintiff.

*See id. at 23-24.* The District Court concluded that Zelinski presented no evidence "to suggest that Weinstock was Zelinski's superior at any time [**6] that he engaged in the alleged acts of sexual harassment." *Zelinski v. Pa. State Police, 282 F. Supp. 2d 251, 266 (M.D. Pa. 2003).* We agree that summary judgment was proper.

n1 [HN4] *Section 1983* provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*42 U.S.C. § 1983 (2004).*

Zelinski offers no evidence that any of the incidents of sexual harassment occurred at any time when Weinstock was in a supervisory position in relation to Zelinski. Both Zelinski and Weinstock were troopers at all relevant times, neither person having authority over the other. The only time Weinstock was in a supervisory [**7] position in relation to Zelinski was at the end of July 2000 when Corporal Altieri was on vacation. No incidents of sexual harassment occurred during this period of time.

The fact that Weinstock was not Zelinski's formal supervisor at the time of the harassment, however, is not dispositive. *See Bonenberger, 132 F.3d at 23-24.* In *Bonenberger,* [HN5] we looked at the substance of the individual defendant's job functions, rather than the form, to determine whether an employee was acting in a supervisory capacity. *Id.* The two primary factors the Court examined to determine whether there was de facto supervisory control were 1) whether the defendant could alter the plaintiff's workload, and 2) whether the plaintiff would face charges of insubordination for failure to obey the defendant's order. *Id.* At all relevant times, Weinstock could not alter Zelinski's workload and Zelinski could not be charged with insubordination for failing to obey Weinstock's orders.

108 Fed. Appx. 700, *; 2004 U.S. App. LEXIS 16576, **

For the foregoing reasons, we will affirm the District Court's grant of Weinstock's motion for summary judgment on Zelinski's *§ 1983* claim.

## B. Summary Judgment for the PSP on the Title VII sexual [**8] discrimination claim

Zelinski also argues that the District Court erred in granting the PSP's motion for summary judgment on her Title [*704] VII claim. [HN6] A plaintiff can establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)*. However, "not all work place conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Id. at 67*. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998)* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993))*.

The District Court held that there was no genuine issue of material fact as to hostile work environment because the harassment Zelinski suffered was not severe or pervasive [**9] enough. We disagree with the District Court and will remand the case on this claim because we do find that there is a genuine issue of material fact.

[HN7] A totality of the circumstances test determines whether the threshold level of severity and pervasiveness has been reached. *Harris, 510 U.S. at 23*. The severity of the harassment, the frequency of the harassment, and the degree of abuse are factors courts should consider. *Id.* Zelinski offers four alleged incidents of sexual harassment as proof that she was exposed to a hostile work environment. The first incident occurred while Weinstock and Zelinski were car pooling from a training session when Weinstock told Zelinski he was sexually attracted to her, placed his hand on her leg, and suggested that he come over to Zelinski's hotel room to give her a full body massage. The second incident occurred while Weinstock and Zelinski were riding in a surveillance van together when Weinstock described in graphic detail the manner in which he wanted to have sex with Zelinski. The third incident occurred when Weinstock told Zelinski, "If I can see down your sweater, everyone else can." The fourth incident occurred when Weinstock, [**10] repeatedly throughout the day, told Zelinski that he could see her underwear.

Aside from these four specific incidents of sexual harassment, other circumstances contributed to the creation of a hostile work environment. Zelinski alleges that Altieri did not believe what Zelinski told him about Weinstock, he criticized her for making the report, and he told Zelinski that Weinstock was a "nice guy." Zelinski also claims that Altieri subjected Zelinski to unjustified criticism concerning the execution of a search warrant and other alleged misconduct, and he placed a disciplinary notation in her file.

There is also a genuine issue of material fact as to whether Weinstock failed to provide Zelinski with protection and assistance during an undercover drug operation. If Weinstock failed to provide Zelinski with protection and if there was a connection between Zelinski's rejections of Weinstock's advances and the failure to provide protection, then a reasonable jury may conclude that the harassment was sufficiently severe and pervasive. By failing to provide Zelinski with adequate protection in the dangerous and sometimes deadly world of drug law enforcement, Weinstock may have created a [**11] hostile work environment. Viewing this incident in light of a comment Weinstock made to another trooper after Zelinski's report to Corporal Altieri, "Laura [Zelinski] tried to hurt me with Lou [Altieri] and now I'm going to hurt her," it becomes more apparent [*705] that Zelinski may have been exposed to a hostile work environment.

All of the alleged incidents that contributed to the hostile work environment occurred over a period of time slightly over one year. The number of incidents in this relatively short length of time shows that the incidents of harassment are more than isolated and unrelated. Considering all of these alleged incidents together, Zelinski has presented enough evidence to establish that there is a genuine issue of material fact, sufficient to go to a fact finder, as to whether she was exposed to a severe and pervasive hostile work environment. Summary judgment in favor of the PSP was inappropriate because "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248*.

For the foregoing reasons, we will vacate the judgment on the Title VII discrimination claim and remand it for further proceedings. [**12]

## C. Summary Judgment for the PSP, Altieri, and Weinstock on the Title VII and *First Amendment* retaliation claims

Finally, Zelinski appeals the District Court's grant of summary judgment in favor of the PSP, Altieri, and Weinstock on her Title VII and *First Amendment* retaliation claims. Zelinski has [HN8] the initial burden of proving a prima facie case of discriminatory retaliation. Zelinski must demonstrate that (1) she engaged in a Title VII protected employee activity, (2) the employer took

an adverse employment action against her, and (3) there is a causal link between the engaged protected activity and the adverse employment action. *Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001)*. The District Court held that Zelinski's report of the sexual harassment incidents to Altieri was not a protected activity under Title VII and that, even if it was, there was no causal connection between the report and her transfer. We disagree with the District Court. We will vacate the judgment on this claim because there are genuine issues of material fact and remand it to the District Court.

[HN9] Protected activities under Title VII include situations where an employee [**13] "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. *42 U.S.C. § 2000e-3(a)*. A formal letter of complaint to an employer or the EEOC is not the only way to meet the protected activity criterion. *Barber v. CSX Distribution Services, 68 F.3d 694, 702 (3d Cir. 1995)*. Protected activities include formal charges of discrimination, "as well as informal protests of discriminatory employment practices, including making complaints to management . . .." *Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)*. It is necessary to analyze the message conveyed, rather than "the medium of conveyance." *Barber, 68 F.3d at 702*.

Zelinski reported the alleged incidents of sexual harassment to her superior, Corporal Altieri, after being questioned about how she was getting along with the other members of the TNT unit. During the conversation, Zelinski related to Altieri the two incidents when Weinstock made sexual advances toward Zelinski. The fact that Zelinski told Altieri that she did not want anything to be done in response [**14] to Weinstock's conduct, does not bar her statements to Altieri from being a protected activity. A reasonable jury could conclude that this conversation fell within the ambit of a protected activity.

The District Court properly held that Zelinski's transfer to a patrol unit was an "adverse employment action" under Title VII. The fact that Zelinski lost neither pay nor rank as a result of the transfer is not [*706] dispositive. *See Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 115-116 (3d Cir. 1996)* (summary judgment reversed where plaintiff claimed that patrol assignment was less desirable than detective bureau, even though plaintiff did not lose pay or rank as a result of transfer); *Torre v. Casio, Inc., 42 F.3d 825, 831 n.7 (3d Cir. 1994)* ("[A] transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action.").

In addition to proving protected activity and adverse employment action, Zelinski must also show a causal relationship between the protected activity (her com-

plaint to Altieri) and the adverse employment action (her transfer from the TNT unit). Zelinski's alleged complaint to Altieri [**15] regarding Weinstock's sexually harassing comments occurred during a conversation in October of 1999. Her transfer from the TNT unit occurred in August of 2000, ten months after her report to Altieri.

In *Farrell v. Planters Lifesavers Co.*, we acknowledged that "our case law is 'seemingly split' as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection for the purposes of a prima facie case of retaliation." *206 F.3d 271, 279 (3d Cir. 2000)* (citing *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)*). The facts and contexts of each case are important in determining whether there is a causal relationship. [HN10] Temporal proximity alone is insufficient to establish the required causal connection when temporal proximity is not "unusually suggestive." *Id. at 280*. "When there may be a valid reason why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation." *Kachmar v. Sungard Data Sys., 109 F.3d 173, 178 (3d Cir. 1997)*.

[HN11] A discharge [**16] occurring two days after a plaintiff filed an EEOC complaint is "unusually suggestive." *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)*. By itself, a nineteen-month span of time was considered too long a period to be "unusually suggestive." *Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)*. The ten-month time period between Zelinski's complaint and her transfer is not as "unusually suggestive" as the two-day period in *Jalil*, but is more "suggestive" then the nineteen-month period of time in *Krouse*. Alone, the ten-month period of time may not meet the threshold test of "unusually suggestive."

By examining the other factors that can establish causation, however, we believe that a rational fact finder could decide that there was causation between the two events. There may have been a valid reason why no adverse action was taken right away. Corporal Altieri began to communicate Zelinski's sexual harassment claims to his superiors sometime before June 2000. It is possible that the individuals with authority to transfer Zelinski (or any other member of the TNT unit for that matter) were unaware of the problems and therefore [**17] did not react before August 2000. The time period between Altieri telling his superiors about the sexual harassment and Zelinski's transfer was a period of only two months. This is much more "unusually suggestive" than a period of ten months.

Zelinski has also presented evidence of at least four incidents of intervening antagonism between the time she told Altieri of her problems with Weinstock and the time

of her transfer. *See Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993)* ("intervening pattern of antagonism" during the period between the protected activity and the adverse employment action can prove causation). Zelinski alleges she was subjected to false criticism [*707] for the execution of a search warrant in January 2000, in front of other troopers; she was unfairly criticized for misconduct in April 2000; and Altieri placed a disciplinary note in her file. Finally, Zelinski maintains that she had to undergo two separate sessions of unwarranted disciplinary counseling in July of 2000.

[HN12] A plaintiff can also establish the causation element by providing evidence of inconsistent reasons for the adverse employment action. *Farrell, 206 F.3d at 281.* [**18] Captain Duignan provided a number of reasons why Zelinski was transferred. Zelinski has presented evidence, contradicting Duignan, to show that a genuine issue of material fact exists pertaining to those reasons. If it is determined that these reasons are merely pretextual, then they can be considered inconsistent reasons for the adverse employment action, ultimately leading to a conclusion of causation. The reasons offered by Captain Duignan for Zelinski's transfer include that 1) Zelinski had an attitude problem, was not a team player, and was difficult to supervise; 2) she bad-mouthed Altieri to other people; 3) she mishandled herself during the execution of a search warrant; 4) she criticized PSP patrol officers; 5) she failed to keep her search warrant probable cause information current; 6) she cancelled a planned undercover drug operation; and 7) she was argumentative during a meeting. Zelinski either denies or offers evidence to negate or contradict each reason.

Viewing all of the other evidence in the light most favorable to Zelinski, the nonmoving party, we believe that a reasonable jury could find in favor of Zelinski regarding the causation element. Therefore, we will vacate [**19] the judgment on the Title VII retaliation claim and remand it to the District Court.

The District Court also granted summary judgment on Zelinski's *First Amendment* retaliation claim based on its ruling on Zelinski's Title VII retaliation claim. *Zelinski, 282 F. Supp. 2d at 273, n.22.* ("As Zelinski has failed to show any retaliation, it is unnecessary to determine whether her complaint was protected speech," for purposes of her *First Amendment* retaliation claim.) Because we are remanding on the issue of retaliation, we must now also consider Zelinski's *First Amendment* retaliation claim. We conclude that there is no validity to the *First Amendment* claim. As we held in *Azzaro v. County of Allegheny, 110 F.3d 968, 977 (3d Cir. 1997)* (en banc), [HN13] "the expressive rights of public employees are more restricted that those of public citizens who are not in an employment relationship with the gov-

ernment." (citing *Connick v. Myers, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983))*. A public employee's speech is protected only if it relates to a matter of public concern, *i.e.*, if "it is important to the process of self-governance that communications [**20] on this topic, in this form and in this context, take place." *Id. at 977.*

In *Azzaro*, we reversed the District Court's grant of summary judgment to the defendants because Azzaro's speech "brought to light actual wrongdoing on the part of one exercising public authority that would be relevant to the electorate's evaluation of the performance of the office of an elected official." *Id. at 978.* The *Azzaro* Court contrasted the situation presented in our case:

> We are not here presented with a situation in which a public employee has filed a complaint about an isolated incident of what he or she perceived to be inappropriate conduct on the part of a non-supervisory co-worker. While we express no opinion on such a situation, it would presumably be less important to an evaluation of the performance of the [*708] public office involved than the situation now before us.

*Id. at 979 n.4.*

Here, Zelinski, a public employee, complained to Altieri about inappropriate conduct by Weinstock, a non-supervisory co-worker. Neither Altieri or Weinstock work directly under any elected official, and their actions do not appear relevant to the electorate's evaluation of the performance [**21] of the office of any elected official. While speech about sexual harassment and other discrimination is certainly important, neither the form, context, nor content of Zelinski's speech support a finding that it addressed a matter of public concern. *See id. at 976* (whether an employee's conduct addresses a matter of public concern "is to be determined by the 'content, form, and context of a given statement'" (quoting *Connick, 461 U.S. at 147-48*)). Zelinski did not make a public speech about the evils of sexual harassment; she, instead, stated in an informal conversation that a non-supervisory co-worker made improper sexual advances toward her but that she did not desire to see any official action taken. This conversation, while protected under Title VII, has little or no "instrumental value to the community in enabling self-governance," *id. at 977*, and thus does not appear to have addressed a matter of sufficient public concern to warrant *First Amendment* protection. For those reasons, we will affirm the dismissal of the *First Amendment* claim.

108 Fed. Appx. 700, *; 2004 U.S. App. LEXIS 16576, **

## IV. Conclusion

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor [**22] of Trooper Weinstock on the *42 U.S.C. § 1983* claim and the judgment dismissing the *First Amendment* retaliation claim. We will vacate the judgment on the Title VII discrimination claim and remand it to the District Court for further proceedings consistent with this opinion.